IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| EDWARD HOLMES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 02 C 7266 |
| v. ) | |
| ) | Magistrate Judge Brown |
| DR. KUL SOOD and WEXFORD HEALTH ) | |
| SOURCES, INC. ) | |
| ) | |
| Defendants. ) | |

## NOTICE OF FILING

TO:

Mr. Michael Charysh
Charysh & Shroeder, Ltd.
33 North Dearborn Street
Suite 1300
Chicago, IL 60602

FILED
APR - 7 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Please take notice that on April 7, 2005 I filed the attached Response to Defendants' Motion for Summary Judgment at the United States Courthouse at 219 South Dearborn, Chicago, Illinois.

Arthur Loevy
Jon Loevy
Amanda Antholt
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Amanda Antholt, an attorney, certify that on April 7, 2005, I sent by hand delivery a copy of the attached Response to the above-named counsel of record.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| EDWARD HOLMES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 02 C 7266 |
| v. | ) |
| | ) Magistrate Judge Geraldine Soat Brown |
| DR. KUL SOOD and WEXFORD | ) |
| HEALTH SOURCES, INC. | ) |
| | ) |
| Defendants. | ) |

FILED
APR - 7 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now Comes Plaintiff, EDWARD HOLMES, by his attorneys, LOEVY & LOEVY, and responding to Defendants' Motion for Summary Judgment, states as follows:

**I.      INTRODUCTION**

Edward Holmes nearly died in the Will County Jail because Defendant Dr. Sood refused to provide him medical treatment. For thirty days, Mr. Holmes suffered excruciating pain, abdominal distention, constipation, vomiting, and nausea. These symptoms grew increasingly dire and obvious every day. He became emaciated while his stomach expanded approximately ten inches. With full knowledge that Mr. Holmes' life was at stake, Dr. Sood did absolutely nothing. It was only the intervention of a social worker, who went to court and begged the judge to release Mr. Holmes from jail so that he could get treatment, that saved Mr. Holmes' life. If Dr. Sood's inaction did not constitute deliberate indifference, nothing could.

Defendants now seek summary judgment, but in order to make their arguments they ignore the great majority of the facts in evidence, and mischaracterize those that remain. However, when all the facts in the record are considered, Defendants cannot meet their burden of showing that no genuine issues of material fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For all the reasons discussed herein, Defendants' Motion for Summary Judgment should be denied.

## II.     SUMMARY OF THE FACTS

From September 13 to October 12, 2001, Plaintiff Edward Holmes was incarcerated at the Will County Adult Detention Facility (henceforth "WCADF") where Defendant Dr. Kul Sood was employed by Defendant Wexford as the sole physician. See Pl.'s Stmt. of Add'l Facts In Opp'n to Defs.' Mot. for S.J. (henceforth "LR 56.1 Stmt.") ¶¶ 1-3.

### Mr. Holmes Medical History

Mr. Holmes had a long history of chronic pain due to abdominal and orthopedic problems. Id. at ¶ 10. Mr. Holmes' medical records, reviewed by Dr. Sood, revealed that he had a history of, among other things, ileus (mechanical or functional obstruction of the bowel) and a prior colostomy. Id. at ¶ 47. The records also showed that just two months prior to his incarceration, Mr. Holmes had been hospitalized with symptoms of abdominal pain, distention and nausea due to colon dysfunction, but had been successfully treated with non-surgical measures of decompressing his colon. Id. at ¶¶ 48-49. With this information, Dr. Sood was on notice that Mr. Holmes condition was fragile and that he was at high risk for serious bowel problems, such as obstruction and dilation. Id. at ¶¶ 82, 84. Indeed, Dr. Sood admitted in deposition that, given his history, if Mr. Holmes experienced any sudden onset of distention, nausea, vomiting, constipation and/or low bowel sounds, he would need to be hospitalized for treatment. Id. at 77.

### Sudden Onset of Symptoms of Colon Dysfunction

On the first day of his detention at WCADF, in light of Mr. Holmes' chronic pain, Dr. Sood authorized him to receive his previously prescribed Vicoprofen. Id. at ¶ 50. Dr. Sood understood, however, that use of narcotic pain relievers, such as the Vicoprofen here, by persons with chronic abdominal conditions can actually impair colon functioning. Id. at ¶ 33. Thus, their use must be closely monitored.

On September 14, 2001, Mr. Holmes' health took a turn for the worse. He experienced abdominal distention and pain, chest pain, and constipation. Id. at ¶ 34-35. Two days later, on September 16, Mr. Holmes was seen by a nurse who documented constipation and rectal bleeding in his chart, and gave him milk of magnesium. Id. at ¶¶ 39-41. The next day, September 17, Dr. Sood physically examined Mr. Holmes, finding his abdomen "abnormal," tender, and tense all over. Id. at ¶¶ 42-43. Dr. Sood recognized the importance of evaluating Mr. Holmes' abdomen; however, evaluation by physical touch was impossible due to the abnormal

2

distention and tenderness. Id. at ¶¶ 43-44. Other methods of examination, such as x-rays or lab tests, needed to be employed, but Dr. Sood did not do so. Id. at 22, 27, 44. Instead, he gave a thirty day prescription for Colace, a stool softener, and Zantac, an antacid. Id. at ¶ 45.

These medications were ineffective and Mr. Holmes' condition continued to worsen with increasing abdominal distention and pain. Id. at ¶ 11-13. The Vicoprofen previously prescribed for his chronic pain no longer alleviated the severe pain being caused by his worsening abdominal condition. Id. at ¶ 30. Nonetheless, when Dr. Sood was updated on Mr. Holmes' condition on September 21, 2001, all he did was continue the Vicoprofen prescription. Id. at 50. Mr. Holmes' symptoms persisted and, on September 26, 2001, he saw Dr. Sood again. Id. at ¶ 51. Dr. Sood still was not able to examine his abdominal cavity by touch because of the extensive distention and tenderness. Id. at ¶¶ 52-53. Again, Dr. Sood did not obtain the necessary diagnostic tests or take any other steps to treat his condition. Id. at ¶¶ 27, 51-52. He told Mr. Holmes that "his hands were tied" and refused Mr. Holmes' requests to be sent out to his own doctors at the nearby Silver Cross Hospital. Id. at ¶¶ 25-26. Mr. Holmes' symptoms had now been progressing for twelve days, there was no other medical option but to obtain the diagnostic reviews and begin treatment to decompress the colon. Id. at ¶¶ 27 -28.

Mr. Holmes described his stomach as "blowing up" and getting "bigger and bigger" throughout the month, causing him excruciating pain and discomfort. Id. at ¶¶ 12-13. He continued to suffer constipation, nausea, vomiting, diarrhea, and increasing pain. Id. at ¶¶ 11-16, 30. During this month, the Wexford nurses saw Mr. Holmes every day and kept Dr. Sood continually notified of Mr. Holmes' worsening condition, but he never responded to Mr. Holmes' increasingly dire symptoms and took no steps to provide the medical treatment that Mr. Holmes so desperately required . Id. at ¶¶ 19-20, 27, 28 (describing necessary treatment).

### Mr. Holmes Nearly Loses His Life

During the last two weeks of his incarceration, Mr. Holmes was gravely ill and could barely leave his cell. Id. at ¶¶ 12, 58-69. He was emaciated, but his stomach was enormous. Id. at ¶¶ 60; Exhibit L (photographs[1]). He was constipated, but suffered some uncontrolled diarrhea while he slept. Id. at ¶¶ 59. He vomited bile and what appeared to Mr.

---

[1] The photographs depict Mr. Holmes as he appeared while detained in October 2001, dramatic evidence that something was quite obviously amiss.

3

Holmes to be waste that his body was unable to dispose of through bowel movements. Id. at ¶ 61. On October 8th he was so sick that he could not get up to appear outside of his cell for the correctional head count, and as a result was punished. Id. at ¶ 58. Correctional officers, upon seeing his condition, said his "time was running out." Id. at ¶ 17. He too felt that he was dying. Id. at ¶ 59. He called home crying so often that his wife, who visited him twice a week, told him that his calls were too upsetting for their young son. Id. at ¶ 13.

In October, social worker Julie Sterr, who worked with WCADF prisoners, made multiple attempts to intervene with the medical unit on Mr. Holmes' behalf. Id. at ¶¶ 56-57. Ms. Sterr could see that his condition was getting worse, his stomach was grossly distended and he obviously in great pain. Id. at ¶ 17. She informed the nurses that she was familiar with bowel obstructions and he required immediate treatment. Id. at ¶¶ 56-57. Unfortunately, the medical unit's treatment of Mr. Holmes, directed by Dr. Sood, did not change. Id. at ¶¶ 27, 57-70.

Mr. Holmes' medical chart for October 11 and 12, 2001 contains numerous entries by the nurses documenting Mr. Holmes' condition, as well as continual notifications to Dr. Sood. Id. at ¶¶ 62-70. His chart describes severe distention, pain, vomiting (including vomiting blood) and diminished bowel sounds. Id. By this time, Mr. Holmes' abdomen had distended approximately ten inches. Id. at ¶ 69. Nurse Christine Keenan also recognized the symptoms as those of a bowel obstruction, but all she was authorized to do was notify Dr. Sood and follow his instructions. Id. at ¶ 80. Even Defendants' own expert, Dr. Clark, was forced to agree that at this point Mr. Holmes required treatment. Id. at ¶ 69. Dr. Sood also knew the symptoms were so such that Mr. Holmes' life was at stake, but at no time did he alter the treatment from that prescribed one month prior, with the exception of some over-the-counter Kaopectate on October 12, 2001. Id. at ¶¶ 27, 78. The purpose of Kaopectate is to relieve diarrhea, it is not medical treatment for the symptoms experienced by Mr. Holmes. Id. at ¶ 70.

Fortunately for Mr. Holmes, Ms. Sterr recognized that his life was in danger and was unwilling to leave it in the hands of Dr. Sood any longer. Worried that Mr. Holmes would not survive the weekend without her intervention, on October 12, 2001, Ms. Sterr went to the criminal court judge and pled for his life, telling the judge, "you got to let him go, they're going to kill him." Id. at ¶¶ 71-73. Although earlier that day Judge Wozack had sentenced Mr. Holmes to three years in prison, he took Ms. Sterr's concerns seriously and that afternoon changed Mr. Holmes' sentence to probation. Id. Mr. Holmes was released at 7:45 p.m. that night. Id. at ¶ 74.

4

### The Aftermath

By 8:00 p.m., Mr. Holmes had arrived at Silver Cross Hospital where his doctors had a bed waiting for him. Id. They first attempted to relieve his condition through conservative measures that had previously been successful when he had suffered similar problems. Id. at ¶ 92, 95. The dilation of Mr. Holmes' colon was too great and his condition did not improve. Id. at ¶ 94. The surgeon, Dr. Darbandi, feared Mr. Holmes' colon could perforate, which could lead to death, and thus he felt he had no choice but to operate. Id. at ¶ 95. Dr. Darbandi found Mr. Holmes' colon to be immensely dilated to unusual proportions in its entirety. Id. at ¶¶ 95-96. He performed an exploratory laparotomy and a total colectomy, in which the majority of Mr. Holmes' grossly distended colon was removed, leaving him with an ileostomy.[2] Id. at ¶¶ 95-96.[3] If Mr. Holmes had reached Silver Cross earlier, the doctors likely could have decompressed his colon without surgery. Id. at ¶ 94. As a result of Dr. Sood's refusal to treat him, Mr. Holmes had to undergo this invasive surgery, as well as numerous other hospitalizations and an unsuccessful surgical attempt to re-connect his bowels, which resulted in complications and another month and a half hospitalization. Id. at ¶¶ 97-98. The physicians have been unable to re-connect Mr. Holmes' bowel and thus he continues to wear an ileostomy bag to this day. Id.

### III. THE EVIDENCE DEMONSTRATES THAT DR. SOOD WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S EXTREMELY SERIOUS MEDICAL CONDITION AND SUMMARY JUDGMENT IS THUS UNAVAILABLE

Ample evidence in the record establishes that Defendant Dr. Sood was deliberately indifferent to Plaintiff's objectively serious medical need and thus summary judgment is unavailable for Dr. Sood on that claim. Plaintiff does not oppose, however, summary judgment on the separate and independent claim against Wexford under a Monell theory of liability.

---

[2] An ileostomy is "an opening into the ileum, part of the small intestine, from the outside of the body. An ileostomy provides a new path for waste material to leave the body after part of the intestine has been removed." See www.medterms.com. As a result of the ileostomy, Plaintiff wears a ileostomy bag on the side of his body.

[3] Mr. Holmes' condition has been diagnosed as a "non-obstructive dilation of the colon" or "pseudo-obstruction." LR 56.1 Stmt. ¶ 83. The condition is symptomatically similar to a mechanical obstruction. Id. As with a mechanical obstruction, Mr. Holmes' colon was not functioning to push waste through, and out of, the body. Id. at ¶ 84. Both conditions, if left untreated, can lead to perforation of the colon which can cause death. Id. at ¶ 86.

### A. THE EIGHTH AMENDMENT DELIBERATE INDIFFERENCE STANDARD

Deliberate indifference to the serious medical needs of prisoners constitutes "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. Estelle v. Gamble 429 U.S. 97, 104 (1976). Constitutional jurisprudence recognizes that when the state incarcerates citizens, it removes their ability to care for themselves, and thus if the authorities fail to provide needed medical attention, the result will effectively be "physical torture or a lingering death'" or, in the least, "pain and suffering which no one suggests would serve any penological purpose." Id. at 103; Helling v. McKinney, 509 U.S. 25, 32 (1993).

The Eighth Amendment deliberate indifference standard contains both objective and subjective elements. First, the medical condition must be objectively serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the official must have subjectively known of and disregarded an excessive risk to the prisoner's health. Id. at 835-37. While this standard is high, it does not go so far as to require Plaintiff to prove Defendant intended the harm, as Defendants' Motion suggests. Haley v. Gross, 86 F.3d 630, 641 (7th Cir. 1996) ("a prisoner claiming deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired"); Vance v. Peters, 97 F.3d 987, 992 (7th Cir.), cert. denied, 520 U.S. 1230 (1997). Instead, Plaintiff simply must show that Dr. Sood "acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842.

### B. MR. HOLMES' CONDITION WAS OBJECTIVELY SERIOUS

A condition is objectively serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity of a doctor's attention." Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997); Reed v. McBride, 178 F.3d 849, 852 (7th Cir. 1999). Courts also consider whether the individual was in "substantial pain" and the affect on daily life. Id.

It cannot be disputed that Mr. Holmes' condition during his thirty days in Dr. Sood's care meets this standard.[4] Lay persons did in fact recognize that Mr. Holmes' condition required treatment: upon observing Mr. Holmes' condition, correctional officers told him that

---

[4] It is unclear from Defendants' hodgepodge of arguments whether they are actually contesting the objective seriousness of Plaintiff's condition, an issue on which all doctors involved in the case, including Defendants' own expert, agree. LR 56.1 Stmt. ¶ 18.

6

"[his] time was running out" and Ms. Sterr made multiple attempts to convince the medical unit to send him to the hospital, and then went so far as to secure his release from the jail altogether in order to save his life. LR 56.1 Stmt. ¶¶ 17, 57. Furthermore, Mr. Holmes' dilated colon, with symptoms of severe pain, constipation, nausea, vomiting, worsening distention, and diminished bowel sounds, was not only extremely painful but was also debilitating. Id. at ¶¶ 12, 13, 58. Cf. Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000) (appendicitis with symptoms of diminished bowel activity, swollen abdomen, temperature and worsening pain is a serious condition); Zentmeyer v. Kendall County, 220 F.3d 805, 810 (7th Cir. 2000) (ear infection is an objectively serious where it "inflicted prolonged suffering" and required extensive treatment); Hudson v. McHugh, 148 F.3d 859, 863 (7th Cir.1998) (untreated epilepsy is a serious condition); Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996) (severe pain is a serious condition).

Moreover, in a case involving a very similar medical condition (and the same defendant no less), the court found that "[a] lengthy history of extreme pain in the abdominal region accompanied by constipation is a condition that even a lay person with no medical training knows requires treatment." Stokes v. Sood, No. 01- 2778, 2001 WL 1518529, at *4 (N.D. Ill. Nov. 29, 2001) citing Chavez v. Cady, 207 F.3d 901, 907 (7th Cir. 2001); Muniz Souffront v. Alvarado, 115 F. Supp. 2d 237, 243 (D.P.R. 2000).

### C. DR. SOOD HAD KNOWLEDGE OF MR. HOLMES' SERIOUS CONDITION AND THE SUBSTANTIAL RISK TO HIS LIFE

The subjective element of deliberate indifference requires that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Plaintiff may establish Dr. Sood's knowledge of the risk by circumstantial evidence, including by "the very fact that the risk was obvious." Id. at 842; Vance, 97 F.3d at 992.

#### 1. Dr. Sood Was Subjectively Aware of Plaintiff's Condition

Dr. Sood acknowledges that he not only physically examined Mr. Holmes twice but also reviewed his medical records and was regularly informed of his worsening condition by the nurses who saw Mr. Holmes daily. LR 56.1 Stmt. ¶¶ 19-20, 46. Specifically, Dr. Sood admits to either seeing Mr. Holmes or being notified of his condition on September 13, 14, 15, 16, 17, 21, 26, and 27 and October 8, 11, and 12, 2001. Id. ¶¶ 19-20, 31-70. Dr. Sood also knew

7

his history and chronic abdominal condition and, therefore, knew that he was at risk of colon dysfunction and that he was experiencing continual and increasing symptoms of colon dysfunction. Id. This evidence is more than sufficient to establish that Dr. Sood was aware of Mr. Holmes' serious condition. See Sherrod, 223 F.3d at 608-11 (knowledge element demonstrated by medical chart); Reed v. McBride, 178 F.3d 849, 854 (7th Cir. 1999) (plaintiff's letters describing condition were sufficient to put defendants on notice).

### 2. Dr. Sood Recognized A Substantial Risk of Serious Harm

The evidence demonstrates that Dr. Sood was not only aware of the condition, but also that the condition presented a substantial risk to Mr. Holmes' health and safety.

#### a. Dr. Sood Knew Mr. Holmes' Symptoms of Colon Dysfunction Presented A Substantial Risk to Mr. Holmes

In defiance of all logic, Defendants argue that Dr. Sood believed Mr. Holmes was only suffering from his chronic abdominal condition. See Def. Mem. at 4. This argument fails for several reasons. First, Dr. Sood has admitted that he knew that abdominal pain, distention, low bowel sounds, diarrhea, nausea, constipation and vomiting are symptoms of colon dysfunction, which if left untreated could lead to death. LR 56.1 Stmt. ¶ 78. For summary judgment purposes, this evidence alone is sufficient to demonstrate that Dr. Sood was aware of the substantial risk of serious harm to Mr. Holmes' life, as well as that he intentionally disregarded that risk. See Sherrod, 223 F.3d at 611 (inferring knowledge from the fact that "Sherrod's symptoms clearly matched some of the symptoms of appendicitis").

Second, Dr. Sood cannot claim ignorance after admitting in deposition that a chronic condition does not negate the possibility of a superceding acute condition. Id. at ¶ 81. Thus, with this knowledge, Dr. Sood knew that he needed to be more sensitive, not less, to any changes in Mr. Holmes' condition. Id. at ¶ 84.[5] Indeed, Dr. Sood admitted that if Mr. Holmes did experience these symptoms while at the WCADF then he should have been sent to an outside facility for further treatment. Id. at ¶ 77.

---

[5] Dr. Sood chose not to conduct any examination which would have verified that Plaintiff was suffering from colon dilation. Defendants cannot now use that failure to argue that Dr. Sood did not know for certain the condition of Mr. Holmes' colon. Farmer, 511 U.S. at 843 (defendant "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.").

8

Third, one look at Mr. Holmes and anyone would have known that he was suffering a severe abdominal problem requiring immediate treatment. LR 56.1 Stmt. ¶ 17; Exhibit L (photographs). Even Dr. Sood exclaimed, upon viewing the photographs depicting Mr. Holmes' abdomen in October 2001, that he should have been taken to the hospital, as did Defendants' expert, Dr. Clark. Id. at ¶ 76.

Finally, this is not the first time that Dr. Sood has encountered this situation. In 1999, one of his patients suffered symptoms of "chronic and excruciating" abdominal pain, irregular bowel movements, and distention but Dr. Sood never conducted any diagnostic or internal examination. Stokes, 2001 WL 1518529, at *2.[6] Stokes was not taken to the hospital until his abdomen was six to eight inches distended and, as a result, he underwent a surgery that removed his ninety-five percent of his small bowel. Id. From this experience, Dr. Sood knew the very dire consequences of delaying diagnosis and treatment of a bowel obstruction.

### b. Dr. Sood Had Actual Knowledge That Mr. Holmes Was At Serious Risk of Substantial Harm Because Others Told Him

Even if Dr. Sood continues to plead ignorance at trial, a jury is not required to believe him for the reasons stated above and because the evidence shows that he was told of the pressing danger. LR 56.1 Stmt. ¶¶ 24-26, 57, 80. Both nurse Christine Keenan and Julie Sterr testified that Mr. Holmes was in serious condition and required additional treatment. Id. at ¶¶ 57, 80. Based on the progress notes, Nurse Keenan communicated with Dr. Sood specifically about Mr. Holmes at least four times. Id. at ¶ 80. Julie Sterr went to the medical unit several times and told them that Mr. Holmes' life was at stake if he did not get the treatment he required. Id. at 57. Dr. Sood admits that he was fully and continually informed of Mr. Holmes' condition by the nurses. Id. at ¶ 19-20.

Finally, the risk was obvious because Mr. Holmes told Dr. Sood that he needed additional treatment through written requests for medical treatment and during the physical

---

[6] Plaintiff's counsel discovered the Stokes allegations researching this Motion. Despite Plaintiff's interrogatories, document requests and deposition questions regarding prior lawsuits against Dr. Sood, as well as his prior experiences with other similar abdominal conditions, this case was never disclosed by him. Therefore, Plaintiff did not have the opportunity to question Dr. Sood about these allegations at his deposition. Nonetheless, Judge Hart's decision provides insight into Dr. Sood's previous experience with a bowel obstruction. Defendants have yet to explain Dr. Sood's failure to disclose the Stokes allegations.

9

examinations (Id. at ¶¶ 24-26, 39-41), and Mr. Holmes' medical history made clear that his symptoms had to be taken seriously. Reed v. McBride, 178 F.3d 849, 854 (7th Cir. 1999) (fact that defendants received plaintiff's letters established subjective knowledge); Vance, 97 F.3d at 993 ("a prison official's knowledge of prison conditions learned from an inmate's communication can ... require the officer to exercise his or her authority and to take the needed action"). Taking the facts in a light most favorable to Plaintiff, this evidence demonstrates that Dr. Sood knew by no later than the beginning of October (and, a jury could reasonably find as early as September 16, 2001) that something was very seriously wrong with Mr. Holmes, far beyond his chronic condition, and he required immediate medical treatment.

### D. DR. SOOD RECKLESSLY DISREGARDED THE SUBSTANTIAL RISK TO MR. HOLMES' LIFE

Because Dr. Sood knew of the risk to Mr. Holmes' life, the issue becomes whether he recklessly disregarded that risk by either "inaction or woefully inadequate action." Hudson v. McHugh, 148 F.3d 859, 863 (7th Cir.1998). Defendants are correct that deliberate indifference does not encompass mere negligence, but Plaintiff does not base his claim on such a theory. Deliberate indifference does encompass, for example, refusals to treat chronic conditions, the refusal to provide prescribed treatment, as well as "erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards." Hardy v. Aguinaldo, No. 02-3614, 2002 WL 31017611, at *5 (N.D. Ill. Sept. 10, 2002) citing Jones v. Simek, 193 F.3d 485 (7th Cir. 1999); Ralston v. McGovern, 167 F.3d 1160, 1162 (7th Cir. 1999); Sherrod, 223 F.3d at 611; Vance, 97 F.3d at 992.

In Sherrod, for example, the defendants knew that the plaintiff's symptoms of abdominal pain in the lower quadrant, diminished bowel sounds, swollen abdomen, elevated temperature and increasing pain "clearly matched some of the symptoms of appendicitis." 223 F.3d at 611. The defendants admitted the plaintiff to the health unit for observation, put him on a liquid diet, and prescribed enemas and pain medication. Id. at 611. Despite all these steps (notably more treatment than in this case), the court held that summary judgment was unavailable because, while defendants provided some medical care, they failed to provide care responsive to the risk that the plaintiff's condition presented (*i.e.*, conduct diagnostic testing or provide treatment for appendicitis). Id. at 611-12.

10

Similarly, in Manning v. Monroe the court denied summary judgment under the deliberate indifference standard despite the fact that the plaintiff was seen by the dentist two times and received pain medications. 151 F. Supp. 2d 976, 993 (N.D. Ill. 2001). Again, while Manning was not totally ignored, the steps taken by the defendant were not responsive to his complaints of mouth pain, migraines, earaches, sleep loss, and weight loss. Id. A similar conclusion is warranted here.

### 1. Dr. Sood Took No Steps to Diagnose Mr. Holmes' Symptoms

Dr. Sood saw Mr. Holmes twice and prescribed pain medication, a stool softener and an antacid as well as the occasional laxative or stool binding agent, but he did not take any steps to diagnose or treat Mr. Holmes' obvious symptoms. LR 56.1 Stmt. ¶¶ 27-28. Specifically, Dr. Sood has admitted that the only steps he took to diagnose the symptoms were the physical examinations in which the abnormal distention and tenderness prevented him from examining Mr. Holmes' abdomen. Id. ¶¶ 27-28. According to experts, Dr. Himmelman and Dr. Franklin, there was no other medical option for responding to Mr. Holmes' condition but to obtain diagnostic tests such as x-rays or lab tests. Id. at ¶ 22. As the Seventh Court has explained, the question is not whether Dr. Sood ignored Mr. Holmes but rather whether Dr. Sood disregarded the risk that was presented. Sherrod, 223 F.3d at 612.

Thus, this case is not the "classic example of a matter for medical judgment" under Estelle that Defendants suggest. Def. Mem. at 2. Unlike this case, the Estelle defendant did diagnose and treat the condition, but the plaintiff had a difference of opinion about which diagnostic method should have been used. 429 U.S. at 107 (finding that prisoners are entitled to medical treatment but not necessarily by the method of their choosing) citing Meriwether v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987) (transsexual prisoner was entitled to medical treatment, but not necessarily the estrogen treatment he requested).[7] Defendants invoke the words "matter of medical judgment" as if they could magicly change Dr. Sood's inaction to action. But Dr. Sood made no medical judgments: he saw a risk and he failed to respond. See Chavez v. Cady, 207 F.3d 901, 904 (7th Cir. 2000) (rejecting "medical judgment" argument

---

[7] Likewise, Snipes v. DeTella, 95 F.3d 586 (7th Cir. 1996), cited by Defendants, is inapplicable here. Mr. Snipes received treatment for his damaged toenail, but he complained because the doctor did not use a local anesthetic. Id. at 592. The court rejected his argument finding that prison doctors must provide adequate and responsive treatment, but not necessarily the preferred treatment. Id.

11

where for ten days nurse gave laxatives to prisoner with severe stomach pain, some vomiting, and a lack of bowel movements before sending him to the hospital).

### 2. Dr. Sood's Woefully Inadequate Treatment

Dr. Sood turned a blind eye to Mr. Holmes' deteriorating condition and continued with the same inadequate treatment of medication already proven to be ineffective. This "treatment" consisted of: (1) authorizing Plaintiff to receive pain medications previously prescribed for his chronic pain; (2) prescribing Colace and Zantacon September 17, 2001; and (3) milk of magnesium once on September 16 and Kaopectate once on October 12. LR 56.1 Stmt. ¶¶ 27-29. None of these medications eased Mr. Holmes' excruciating pain or improved his continually deteriorating condition (in fact the pain medication only further endangered his life) and yet Dr. Sood never changed his course of treatment in response to the increasingly severe symptoms. Id. at ¶ 28, 30.

Defendants are free to argue at trial that these medications were a sufficient response to Mr. Holmes' condition, but a jury could just as easily find that Dr. Sood's failure to alter his treatment of Mr. Holmes is evidence of his indifference to Mr. Holmes' deteriorating condition and not, as Defendants argue, signs of his attention to Mr. Holmes' condition. Sherrod, 223 F.3d at 612. See also Reed, 178 F.3d at 854 ("the fact that a prisoner received some medical attention does not necessarily defeat his claim; deliberate indifference to a serious medical need can be manifested by 'woefully inadequate action' as well as by no action at all"); Manney v. Monroe, 151 F. Supp. 2d 976, 993 (N.D. Ill. 2001) ("As in Chavez and Bolden, a reasonable jury could conclude that merely treating Mr. Manney's dental condition with these pain relievers (similar to laxatives in Chavez and Tylenol in Bolden ) was wholly inadequate, especially considering that he ultimately had four teeth pulled.").[8]

---

[8] Any contention by Defendants that Plaintiff did not exhibit all the signs of an obstruction at the exact same time (a contention that Plaintiff would deny, see LR 56.1 Stmt. ¶¶ 11-12) would also be a question of fact and credibility for the jury. Sherrod, 223 F.3d at 611 ("The absence of some symptoms might convince a jury that the risk of a ruptured appendix was not sufficiently known or disregarded, but the district's court's finding that his symptoms 'did not match those of appendicitis,' resolved a genuine factual issue in the defendants' favor."). Likewise, any contention that Plaintiff's condition was not deteriorating would be based only on Defendants' own failure to codify Plaintiff's pain in the medical records and is disputed by Plaintiff's testimony, as well as that of his wife Marilyn Holmes, fellow WCADF detainee Timmie Smith, Christine Keenan, and Julie Sterr. LR 56.1 Stmt. ¶ 11-12.

Had Dr. Sood employed any diagnostic tests to examine Plaintiff's abdomen he would have learned that Plaintiff's colon was dilated (and becoming increasingly so over time). LR 56.1 Stmt. ¶ 85. Any number of treatment measures could have been taken to decompress the colon. Id. at ¶¶ 89-92 (describing treatments). The sooner the dilation was caught, the more likely these treatment measures would have successfully decompressed the colon without surgery. Id. at ¶¶ 85-87, 94. Dr. Sood's failure to take any of these treatment measures constitutes "inaction" or, at best, "woefully inadequate action" under the deliberate indifference standard. See Sherrod, 223 F.3d at 608-11 (defendants treatment consisting of a liquid diet, enemas, and pain pills was inadequate response to symptoms of appendicitis); Jones, 193 F.3d at 490 (months delay in sending prisoner with deteriorating arm condition to a specialist, refusal to provide pain medication and follow advice of the specialist constituted deliberate indifference).

### 3. Defendants' Misguided Arguments Fail to Defeat Plaintiff's Claim That Dr. Sood's Response Was Woefully Inadequate At Best

Defendants' argument that this is not a case where the plaintiff was denied treatment, medical attention or medication completely misses the point. Def. Mot. at 4.[9] Plaintiff spent a month requesting, and being denied, medical treatment. LR 56.1 Stmt. ¶¶ 23-26. The only medication he was provided was absolutely ineffective in treating his increasing pain and his life threatening condition, which was otherwise ignored. Id. at ¶ 30.

To the extent that Defendants argue that Plaintiff's only criticism is that Dr. Sood did not conduct any diagnostic testing, they misconstrue Plaintiff's case. Def. Mem. at 3-5. As Plaintiff's experts explained in their reports and depositions, and much like the Sherrod case, diagnostic testing was the first necessary step to identify the cause of the problem and thereby enable the treaters (whether that be Dr. Sood or outside physicians) to provide the necessary treatment. Id. at ¶ 88-89.

---

[9] Furthermore, and importantly, Defendants' memorandum makes factual assertions and argument without citing evidence in the record. Many of the factual contentions are unsupported by even their own statement of facts, much of which Plaintiff disputes. See Pl.'s Resp. to Defs.' Stmt. of Facts. For example, Defendants argue that Plaintiff's expert conceded that Mr. Holmes improved from September 17 to 26, 2001; this is untrue and highly disputed. Id. at ¶ 33. Likewise, Defendants state that Mr. Holmes' surgery was on October 16, 2001, it was actually on October 14, 2001. LR 56.1 Stmt. ¶ 95. These unsupported factual arguments should not be considered by the Court. See Johnson v. Spiegel, Inc., No. 02 C 0680, 2002 WL 1880137, at *4 (N.D. Ill. Aug. 15, 2002) ("Unsupported statements in a brief are not evidence and cannot be given any weight.") citing In the Matter of Morris Paint and Varnish Co., 773 F.2d 130, 134 (7th Cir. 1985).

Finally, Defendants' Motion relies on the fact that Plaintiff's expert, Dr. Himmelman, did not use the magic words "deliberate indifference" but instead testified in terms of how Dr. Sood's treatment departed from accepted professional practices. Def. Mem. at 4-5. The purpose of the expert testimony is not to make legal conclusions of whether or not Dr. Sood was deliberately indifferent, but to provide the Court, and eventually the jury, with valuable insight into the medical condition and the standard practices for responding to that condition. Their testimony need not directly resolve the ultimate legal issue in order to provide evidence of deliberate indifference. See Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-262 (7th Cir. 1996) ("deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment").

## IV. PLAINTIFF HAS ESTABLISHED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Illinois law has long allowed tort actions for emotional distress where it is caused by conduct that is intentional or indicative of gross indifference to the consequences. To recover, Plaintiff must prove that: (1) Defendant's conduct was extreme and outrageous; (2) Defendant either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) Defendant's conduct actually caused severe emotional distress. McGrath v. Fahey, 126 Ill.2d 78, 533 N.E.2d 806 (1988). "Conduct is extreme and outrageous where recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Doe v. Calumet City, 161 Ill.2d 374, 392, 641 N.E.2d 498, 506 (1994) *quoting* Restatement (Second) of Torts §§ 46, Comment *d*, at 73 (1965).

Mr. Holmes' life was literally in the hands of Dr. Sood. Because he was incarcerated, Mr. Holmes had no options other than to rely on Dr. Sood to save his life. As described above in detail, the evidence shows that by refusing to provide treatment, Dr. Sood willfully caused Mr. Holmes to suffer excruciating pain and come very close to death. He was emaciated, his stomach was blown up to an unimaginable degree, he was constipated, vomiting blood and waste, and thought he was dying. LR 56.1 Stmt. ¶¶ 11-18. Had it not been for Ms.

14

Sterr's persistence, Dr. Sood would have let Mr. Holmes die by failing to respond to his worsening condition.[10]

In Ralston, the Seventh Circuit characterized the withholding of pain medications to a prisoner suffering from cancer as "border[ing] on barbarous." 167 F.3d at 1161-62. Likewise, the conduct here was nothing less than the "physical torture or a lingering death" the Supreme Court described in Estelle v. Gamble, 429 U.S. 97, 103 (1976). These facts, and all those discussed above establishing Dr. Sood's "deliberate indifference" (the equivalent of criminal recklessness), are sufficient to establish intentional infliction of emotional distress for Rule 56 purposes. See e.g. Bunyon v. Burke County, 306 F. Supp. 2d 1240, 1262 (S.D. Ga. 2004) (holding that defendant's failure to provide medical assistance to plaintiff was sufficient evidence to establish a claim of intentional infliction of emotional distress).

## V. SUMMARY JUDGMENT MUST ALSO BE DENIED ON THE RESPONDEAT SUPERIOR CLAIM AGAINST WEXFORD

More than sufficient evidence establishes Plaintiff's claim against Wexford under respondeat superior for liability for the intentional infliction of emotional distress. Wexford may prefer to call Dr. Sood an "independent contractor," but wishing will not make it so. Illinois law controls the issue of agency.

Regardless of the label that Wexford seeks to place on its relationship with Dr. Sood in an effort to avoid liability, if an agency relationship existed then Wexford may be held liable for Dr. Sood's conduct under the doctrine of respondeat superior. Petrovich v. Share Health Plan of Illinois, Inc., 188 Ill.2d 17, 42, 719 N.E.2d 756, 770 (1999); Lang v. Siva, 306 Ill. App. 3d 960, 972, 715 N.E.2d 708, 716 (1999). See also Letsos v. Centrury 21-New West Realty, 285 Ill. App. 3d 150, 153, 675 N.E.2d 217, 224-25 (1996) ("Whether the parties' relationship is that of principal and agent or owner and independent contractor, however, is a question of fact unless the relationship is so clear that it is indisputable.").

The primary factor in determining whether a person is an employee, and thus an agent, or an independent contractor is the right to control the manner in which the work is

---

[10] Defendants' Memorandum argues without citation to the record that Plaintiff's experts testified that Dr. Sood was properly treating Mr. Holmes. Def. Mem. at 6. As with many of the facts asserted in Defendants' argument, this is simply not true. See Plaintiff's Response to Defendants' Statement of Facts Nos. 13-15.

15

performed. Lang, 306 Ill. App. 3d at 972. Other factors include the right to discharge, the method of payment, whether taxes are deducted from payment, the level of skill required, the furnishing of the necessary tools, materials, and equipment, and the work schedule. Id.; Wheaton v. Suwana, 291 Ill. Dec. 407, 823 N.E.2d 993 (Ill. App. 5 Dist. 2005).

Dr. Sood is an agent of Defendant Wexford, not an independent contractor. See Lang, 306 Ill. App. 3d at 972 ("An independent contractor undertakes to produce a certain result but is not controlled as to the method in which he obtains that result."). Most importantly, Wexford controls the manner in which he performs his work with thousands of pages of guidelines, standards, protocols, report requirements, and case-specific management. LR 56.1 Stmt. ¶ 7. For example, these policies direct the manner in which Dr. Sood treats patients with certain conditions, how he runs the medical unit, and even requires Dr. Sood to consult with a "utilization review manager" regarding treatment of patients with serious conditions, thus supervising Dr. Sood's treatment of patients. Id. at 7-9. Whether or not Wexford controlled Dr. Sood's decision to not obtain treatment for Mr. Holmes in 2001 has no bearing on this analysis. Commerce Bank v. Youth Services of Mid-Illinois, Inc., 333 Ill. App. 3d 150, 153, 775 N.E.2d 297, 300 (Ill. App. 4 Dist. 2002) ("It does not matter if the right to control was not actually exercised.") citing Ross v. Cummins, 7 Ill. 2d 595, 600, 131 N.E.2d 521, 524 (1956).

Turning to the other factors, Wexford also provides all of the tools, materials and equipment in the medical unit. LR 56.1 Stmt. ¶ 2. Notably, at his deposition Dr. Sood refused to answer questions regarding how much money he earns from Wexford on the grounds of "company confidentiality" and defense counsel objected to the questioning on the grounds of relevance and instructed Dr. Sood not to answer the question. Id. at ¶ 4. The contract produced in litigation indicates that Dr. Sood submits time sheets to Wexford and is paid monthly, as well as that Wexford maintains professional/medical liability insurance for his practice at WCADF. See Exhibit U. Wexford also sets Dr. Sood's work schedule. Id. at ¶ 5.

Finally, in Petrovich v. Share Health Plan of Illinois, Inc., the Illinois Supreme Court found that an HMO, which exercised significantly less control over its physicians than Wexford does here, could be held vicariously liable for the negligence of its independent-contractor physicians under both the doctrines of apparent authority and implied authority. 188 Ill.2d at 52. See also Gilbert v. Sycamore Mun. Hosp., 156 Ill.2d 511, 523, 622 N.E.2d 788, 795-96 (1993) (hospital viciously liable for conduct of physician independent contractor); Wheaton v.

16

Suwana, 291 Ill. Dec. 407, 823 N.E.2d 993 (Ill. App. 5 Dist. 2005) (finding physician to be an employee of hospital and not an independent contractor). Defendant Wexford's Motion for Summary Judgment on Plaintiff's claims of Intentional Infliction of Emotional Distress and Respondeat Superior relating thereto must be denied.

## Conclusion

For thirty days, Mr. Holmes suffered immense pain and anguish as his physical condition deteriorated and Dr. Sood refused to provide him with any necessary medical treatment. Under these facts, well established by the evidence in the record, summary judgment should be denied on the Eighth Amendment claim against Dr. Sood for his deliberate indifference and against both Dr. Sood and Wexford, under respondeat superior, on the claim of Intentional Infliction of Emotional Distress.

RESPECTFULLY SUBMITTED,

_____
Attorneys for Plaintiff

Amanda Antholt
Arthur Loevy
Jon Loevy
Jon Rosenblatt
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312)243-5900

17