

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

EDWARD HOLMES,       )
     Plaintiff,        )
                 )
v.                   )     **Case No. 02 C 7266**
                 )     **Magistrate Judge Geraldine Soat Brown**
DR. KUL SOOD and      )
WEXFORD HEALTH SOURCES, INC.,   )
     Defendants.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Edward Holmes ("Holmes") brought this action pursuant to 42 U.S.C. § 1983, alleging that Dr. Kul Sood ("Dr. Sood") and Wexford Health Sources, Inc. ("Wexford") (collectively, "Defendants") violated Holmes' civil rights by deliberate indifference to his medical needs when Holmes was incarcerated at the Will County Adult Detention Facility ("WCADF"). (Second Am. Compl. ¶¶ 1, 5-19.) [Dkt 33.] Particularly, Holmes claims that Defendants' failure to treat his abdominal pain and distention properly necessitated subsequent surgery and treatment. (*Id.*) Holmes also alleges pendent state law claims of intentional infliction of emotional distress and respondeat superior. (*Id.* ¶¶ 20-28.) Defendants have moved for summary judgment. [Dkt 66.] The parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 22, 23.] For the reasons set forth below, Defendants' motion for summary judgment is granted as to Holmes' intentional infliction of emotional distress and respondeat superior claims, granted as to Holmes § 1983 claim against Wexford, and denied as to Holmes' § 1983 claim against Dr. Sood.

## FACTUAL BACKGROUND[1]

### A.   Relationship Between Wexford and Dr. Sood

Wexford contracted with WCADF to provide medical care to the inmates. (Pl.'s LR Resp. ¶ 2.) In 2001, Wexford employed a full time nursing staff and a Medical Director/physician at WCADF. (Defs.' LR Resp. ¶ 3; Pl.'s LR Ex. E at § 2.1.) Dr. Sood was the Medical Director for WCADF on a contract basis with Wexford, working approximately 12 hours a week at WCADF. (Pl.'s LR Resp. ¶ 3; Defs.' LR Resp. ¶ 5.)

The medical unit at WCADF also had eight or nine registered nurses who assisted the doctor, administered medication, responded to inmate requests, and implemented the doctor's orders. (Pl.'s LR Ex. C, Dr. Kul Sood Dep. Vol. I at 87; Pl.'s LR Ex. N, Affidavit of Christina Keenan ¶ 3.) The nurses did not have decision-making authority for the treatment of patients; rather, the decisions for treatment plans and whether to send patients for outside medical care were the responsibility of Dr. Sood. (Keenan Aff. ¶ 3.) In 2001, Dr. Sood had sole decision-making responsibility for ordering tests for the inmates at WCADF. (Sood Dep. Vol. I at 76-77.) As the Medical Director, Dr. Sood had final responsibility for supervising medical and treatment decisions for the care provided to patients at WCADF, and was responsible for Holmes' medical care and treatment while he was detained at WCADF. (Defs.' LR Resp. ¶ 9; Pl.'s LR Ex. O ¶ 31.)[2]

---

[1]  The following facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pl.'s LR Resp. ¶ ___" [dkt 75] and "Defs.' LR Resp. ¶ ___" [dkt 77], and from the exhibits submitted with those statements or responses to those statements, or legal memoranda, which are cited herein as: "Pl.'s LR Ex. ___" [dkt 74] and "Defs.' LR Ex. ___" [dkt 69]. Statements not responded to or not controverted by specific references to the record are deemed admitted. L.R. 56.1(b)(3).

[2]  Although Defendants denied Pl.'s LR Stmt. ¶ 9 as it pertains to whether the Medical Director had final authority over the medical treatment of inmates at WCADF, they did not specifically dispute the statement that Dr. Sood was responsible for Holmes' medical care and

**B. Holmes' Health Prior to Incarceration**

Prior to his incarceration, Holmes had chronic abdominal distention, and suffered from chronic abdominal pain and a chronic orthopedic condition. (Defs.' LR Ex. C, Dr. Saeed Darbandi Dep. at 52; Defs.' LR Resp. ¶ 10.) On July 28, 2001, prior to his incarceration, Holmes was seen by Dr. Saeed Darbandi who found that Holmes had a mildly distended abdomen with some lower abdominal tenderness, no guarding, no rebound tenderness, and no masses. (Darbandi Dep. at 31-32.) The finding of no guarding and rebound tenderness means that the patient did not require immediate surgery. (*Id.*)

**C. Holmes' Health During Incarceration**

Holmes was incarcerated at WCADF from September 13, 2001 to October 12, 2001. (Pl.'s LR Resp. ¶¶ 1, 6.) During that time, Holmes suffered from stomach pain, constipation, diarrhea, nausea, vomiting, and difficulty eating and digesting food. (Defs.' LR Resp. ¶ 11; Defs.' LR Ex. B, Edward Holmes Dep. at 126-27, 130-32.)[3] At the time he was incarcerated, Holmes told Wexford

---

treatment while he was detained at WCADF. (Defs.' LR Resp. ¶ 9.) Thus, that fact is admitted. *See* L.R. 56.1(b)(3)(B).

[3] Defendants attempt to dispute this statement of fact by stating that "Holmes made complaints documented in his medical records on various occasions as reflected in his medical records." (Defs.' LR Resp. ¶ 11, citing Plaintiff's Ex. M, a compilation of Holmes' medical records.) However, Defendants fail to specify which portion of this statement is disputed, and the court will not sift through the medical record in an attempt to determine what portion of this statement is properly disputed. Thus, that statement will be deemed admitted. *See* L.R. 56.1(b)(3). Defendants asserted that type of response to a number of Plaintiff's statements of additional facts, and where the dispute is not clear and the supporting evidence is not specific or simply refers to Plaintiff's medical records, the statements will be deemed admitted.

3

employees that he had chronic pain, recently had a colostomy reversed, and his stomach hurt.[4] (Pl.'s LR Resp. ¶ 7.) At that time, Holmes' abdomen was distended and he provided a history of abdominal distention for years. (*Id.* ¶ 8; Holmes Dep. at 91-92.) Holmes also informed the medical staff that he had a history of colon cancer. (Defs.' LR Resp. ¶ 32.) Holmes did not actually have colon cancer, but testified that he had previously been told by a physician that he did. (*Id.*) Holmes was taking pain medication, including Vicoprofen and Methadone at the time he entered WCADF. (Holmes Dep. at 91-92; 98-100.) Dr. Sood authorized the continuation of Vicoprofen (a narcotic pain reliever), which had been prescribed by Holmes' outside doctor as a pain reliever. (Pl.'s LR Resp. ¶ 37; Defs.' LR Ex. F, Dr. Kul Sood Dep. Vol. II at 38.) Vicoprofen can cause constipation and abdominal problems. (Sood Dep. Vol. II at 38.) The Vicoprofen was not prescribed to treat Holmes' abdominal condition. (*Id.* at 38-39.)

During his detention at WCADF, Holmes was visibly ill. (Defs.' LR Resp. ¶ 17; Holmes Dep. at 119, 224.) The nurses saw Holmes every day. (Defs.' LR Resp. ¶ 19; Holmes Dep. at 94-95.) Dr. Sood personally saw Holmes on several occasions and was regularly informed of his condition through review of his medical chart and phone calls from the nursing staff. (Defs.' LR Resp. ¶ 19; Keenan Aff. ¶ 8; Sood Dep. Vol. II at 40-41.) On September 14, 2001, Holmes was seen by medical personnel at WCADF, complaining of chest pain, and the medical staff noted that his abdomen was very distended with pain of an unknown etiology. (Pl.'s LR Resp. ¶ 38; Defs.' LR Resp. ¶ 35.) He also complained of chronic hip, abdominal and intestinal pain, and fistula drainage, as well as a history of carcinoma with multiple surgeries. (Pl.'s LR Resp. ¶ 39; Defs.' LR Resp. ¶

---

[4] A colostomy is the formation of an artificial outlet for the contents of the large intestine (colon) through the wall of the abdomen. J. E. Schmidt, *Attorneys' Dictionary of Medicine*, Vol. 2, C-361 (Matthew Bender, Nov. 2004).

4

36.) On the other hand, Holmes reported that he had a good bowel movement and was passing gas. (Pl.'s LR Resp. ¶ 39.) His abdomen was reported as distended but he had good bowel sounds. (*Id.*) As a result of this examination, Dr. Sood prescribed "continue present management." (*Id.* ¶ 40.) Dr. Sood prescribed Clonidine (a blood pressure medicine) twice daily for Holmes, unrelated to Holmes' abdominal condition. (Defs.' LR Resp. ¶ 37.)

On September 15, 2001, Dr. Sood was informed of Holmes' condition and he prescribed Vicoprofen for pain. (*Id.* ¶ 38.)

On September 16, 2001, Holmes submitted a written inmate health service request complaining of a fistula in his rectum, which is a chronic condition, a history of carcinoma, constipation, vomiting, and bleeding in his rectum. (Pl.'s LR Resp. ¶ 42; Defs.' LR Resp. ¶¶ 39, 40.) That day, a nurse recorded that Holmes complained of "constipation for a couple of []" (sentence was not completed), as well as reversal of colostomy. (Defs.' LR Resp. ¶ 40.) When inmates complain of constipation for a couple of days, the nurses follow a standard protocol of giving the inmate milk of magnesia. (Pl.'s LR Resp. ¶ 42.) Dr. Sood reviewed the September 16, 2001 request for medical care, and Holmes was given milk of magnesia. (Defs.' LR Resp. ¶ 41.) However, Dr. Sood testified that if there had been a sudden onset of abdominal distention, nausea, vomiting, constipation, and low bowel sounds, he would have sent Holmes to the hospital. (*Id.* ¶ 77; Sood Dep. Vol. II at 120-21.)

Dr. Sood conducted a physical examination of Holmes on September 17, 2001 and noted that his abdomen was "questionable to evaluate," meaning "hard to evaluate at that time," because of distention and/or tenderness. (Sood Dep. Vol. II at 57-58, 65-66.) During the physical examination, Dr. Sood found that Holmes' abdomen was abnormal, "tender-tense" with diffuse tenderness, and

"masses, questionable to evaluate." (Pl.'s LR Resp. ¶ 43; Sood Dep. Vol. II at 65.) Dr. Sood prescribed Colace (a stool softener) and Zantac (an antacid) twice a day for thirty days for abdominal discomfort. (Pl.'s LR Resp. ¶ 44; Defs.' LR Resp. ¶ 45.) Even though Dr. Sood had difficulty evaluating Holmes' abdomen due to distention and/or diffuse tenderness, he did not take any other steps to evaluate Holmes' abdomen. (Defs.' LR Resp. ¶¶ 21, 43; Sood Dep. Vol. II at 171-72.) Because of Holmes' medical history and symptoms it was important to evaluate for masses or enlargements of the intestine. (*Id.* ¶ 44.) Dr. Sood could have evaluated Holmes' intestinal tract through diagnostic studies such as x-rays, obstructive series films, or ultrasound. (*Id.* ¶ 22.) Dr. Himmelman, one of Holmes' experts, believes that after that examination, Dr. Sood should have sent Holmes to have an obstructive series of abdominal x-rays and surgical consultation. (Defs.' LR Ex. E, Robert Himmelman Dep. at 103.) However, Dr. Himmelman admitted that on September 17, 2001, Holmes apparently did not have an acute surgical abdomen. (*Id.* at 105.)

On September 21, 2001, Dr. Sood was informed of Holmes' condition and he continued the prescription for Vicoprofen. (Defs.' LR Resp. ¶ 50.) Dr. Sood also reviewed Holmes' medical records from Silver Cross Hospital and learned that Holmes had a chronic abdominal condition, including a history of sigmoid stricture, pancreatitis, a previous colostomy, and ileus.[5] (*Id.* ¶¶ 46, 47.) Through those records, Dr. Sood learned that Holmes had been hospitalized in July 2001 with complaints of abdominal pain and nausea, and that a dilation of Holmes' colon at that time was successfully treated without surgical intervention by adjusting his medications, providing intravenous

---

[5] Ileus is the obstruction in any part of the intestine (not necessarily the ileum), and also the condition resulting from the obstruction. It is marked by abdominal pain, nausea, vomiting and fever. Schmidt, *Attorneys' Dictionary of Medicine* at Vol. 3, I-23.

fluids, enemas and a nasogastric tube. (*Id.* ¶¶ 48, 92; Pl.'s LR Ex. M, Holmes' medical records W001004-W001014.)

On September 26, 2001, Nurse Keenan noted that Holmes complained of abdominal pain, denied constipation, had a normal bowel movement, and had run out of medication. (Sood Dep. Vol. II at 77-78.) Dr. Sood physically examined Holmes on September 26, 2001, and his notes document Holmes' complaints of abdominal pain and distention. (Defs.' LR Resp. ¶ 51.) Dr. Sood testified that Holmes was not in acute distress, his vital signs were stable, his abdomen was distended, bowel sounds were active, and there was no guarding or rebound. (Sood Dep. Vol. II at 79.) At that time, Dr. Sood prescribed Tylenol 3 for pain. (Defs.' LR Resp. ¶ 52; Himmelman Dep. at 84.) Dr. Sood recorded that Holmes' abdomen was "very hard to evaluate organomegaly."[6] (*Id.*) Dr. Sood was unable to palpitate Holmes' liver or spleen or any specific organ or mass in the abdominal cavity. (Pl.'s LR Ex. P, Dr. John Clark Dep. at 100.) Even though Dr. Sood currently has no memory of how distended Holmes' abdomen was on September 26, 2001, he testified that his examination that day showed that Holmes was stable and not in acute distress. (Sood Dep. Vol. II at 79-81.) However, Dr. Himmelman testified that there is some "incongruence between what . . . [Dr. Sood] said in his examination and how he treated [Holmes]," because even though Dr. Sood noted that Holmes was not in any acute distress, he still prescribed Tylenol 3 for pain. (Himmelman Dep. at 84-85.)

On September 27, 2001, Dr. Sood was informed about Holmes' condition and prescribed Vicoprofen and Tylenol 3. (Defs.' LR Resp. ¶ 54.)

On September 30, 2001, Holmes refused to take Colace (a stool softener) because it was

---

[6] Organomegaly means "enlarged organs." (Defs.' LR Resp. ¶ 53.)

"making [him] want to vomit." (Pl.'s LR Resp. ¶ 49; Holmes Dep. at 148.)

In the last couple of weeks that Holmes was incarcerated at WCADF, Holmes was constipated, his stomach was distended, and he thought that he was going to die. (Defs.' LR Resp. ¶ 59; Holmes Dep. at 116-19.) In October 2001, Holmes was emaciated and his stomach was extremely distended. (Defs.' LR Resp. ¶ 60; Pl.'s LR Ex. X, Timothy Smith Dep. at 42-45). In his Response to Defendants' Motion for Summary Judgment, Holmes attached photographs of his abdomen that were taken on October 15, 2001. (Pl.'s LR Ex. L, Photographs and Affidavit of Marilyn Holmes[7] ¶¶ 6, 7.) Marilyn Holmes[7], Mr. Holmes' wife, took these photographs at the Silver Cross Hospital and swears that the photographs are a "fair, accurate and true depiction of Mr. Holmes on October 14 and 15, 2001 and for at least, approximately, one week prior to his release from the Will County Jail." (*Id.*) Those photographs show that Holmes was grossly distended, which would have been obvious to any layperson.[8]

On October 8, 2001, Holmes was so sick that he could not get up for the correctional head count and, as a result, was punished by the correctional staff and given three hours of segregation. (Defs.' LR Resp. ¶ 58; Holmes Dep. at 109-10.)

Dr. Sood was informed of Holmes' condition throughout October 11 and 12, 2001. (Sood

---

[7] For the sake of clarity, Plaintiff's wife, Marilyn Holmes, will be referred to herein as "Marilyn."

[8] In Defendants' LR Response, they hint that they object to those photographs on the ground that Marilyn's affidavit was not submitted until Holmes' Response was filed. (Defs.' LR Resp. ¶ 17.) The fact that an affidavit is submitted in response to a motion for summary judgment is not itself a basis for striking the affidavit. Notably, Defendants do not argue that the photographs were not produced in discovery, nor do they provide any other reason for the court to disregard the photographs. Defendants note that fact discovery closed on January 30, 2004. (*Id.*) However, Defendants did not file any motion pursuant to Fed. R. Civ. P. 56(f) to seek any further discovery. Defendants have not moved to strike or exclude this evidence, and therefore, it will be considered for the purpose of this summary judgment motion.

Dep. Vol. II at 108-13.) On October 11, 2001, Holmes submitted an inmate health service request, complaining of soft bowel movements, abdominal pains and vomiting, but denying constipation. (Med. Record No. W001027.) His abdomen was hard and his bowel sounds were low. (Sood Dep. Vol. II at 86-88.) Medical progress notes from October 11 show abdominal distention, hard abdomen, pain, vomiting, missed meals, and soft bowel movements. (Defs.' LR Resp. ¶ 62.) At 2:00 p.m. on October 11, 2001, Holmes' bowel sounds were low in all four quadrants and his abdominal girth was 40 inches. (*Id.* ¶ 63.) At this time, Holmes was in abdominal distress. (*Id.* ¶ 65.) However, Dr. Sood testified that he was not concerned about the abdominal distress because of Holmes' history of abdominal surgeries and distress. (Sood Dep. Vol. II at 93-94.) That evening, Holmes thought he was "impacted" and complained of abdominal pain, and his bowel sounds were low. (*Id.* at 108, 111; Med. Record No. W001028.) Holmes was given a cup to obtain a stool sample to determine whether there was blood in his stool, but the test showed no blood. (Pl.'s LR Resp. ¶ 52.) At 11:40 p.m., Holmes had diarrhea. (Defs.' LR Resp. ¶ 67.)

In the early morning hours of October 12, 2001, Dr. Sood was notified that Holmes was complaining of pain, his bowel sounds were diminished in all four quadrants, and he had diarrhea. (*Id.* ¶ 68.) The medical progress notes document that at 11:00 a.m., Holmes told the medical staff that he was throwing up blood and the medical staff noted that Holmes had one loose watery stool with no blood in stool, abdominal distention, diminished bowel sounds in all four quadrants, and an abdominal girth measuring 42 inches. (*Id.* ¶ 69; Sood Dep. Vol. II at 118.) At that time, Dr. Sood prescribed Kaopectate for diarrhea. (Pl.'s LR Resp. ¶ 53.)

On October 12, 2001, Holmes' abdomen measured 42 inches. (Sood Dep. Vol. II at 118.) According to Holmes and his wife Marilyn, that is about 10 inches larger than his normal waist size. (Holmes Dep. at 83-85; Pl's LR Ex. K, Marilyn Holmes Dep. at 39-41.) Timothy Smith, another

inmate at WCADF, testified that Holmes' stomach appeared fairly normal when he entered WCADF on September 13, 2001, but that during the next two to three weeks it had started swelling bigger and bigger each day. (Smith Dep. at 42-45.)

Julie Sterr, a social worker who regularly worked with detainees at WCADF, intervened with the medical staff on Holmes' behalf several times in the weeks prior to his release. (Pl.'s LR Ex. D, Julie Sterr Dep. at 6-7, 10-16, 25-26.) Sterr concluded that Holmes' condition was life-threatening, with symptoms of a bowel obstruction requiring treatment. (*Id.* at 12, 18, 25-26.) She made multiple requests for Holmes to be provided the treatment he required. (*Id.* at 12-18, 25-26.) Defendants admit that Sterr appeared before Judge Wozack and requested that he order Holmes' release from jail due to his health condition, even saying "You got to let him go, they're going to kill him." (Defs.' LR Resp. ¶ 72; Sterr Dep. at 15-18.) Holmes was released from custody at approximately 7:45 p.m. on October 12, 2001. (Defs.' LR Resp. ¶ 74.) Holmes' wife picked him up and took him directly to Silver Cross Hospital where his doctors had a room waiting for him. (*Id.*)

Holmes' expert concluded that Holmes' pain and distention increased during his detention at WCADF, and upon leaving the facility he was found to have dilation of his colon. (Defs.' LR Resp. ¶ 16; Pl.'s LR Ex. G, James L. Franklin Expert Report.) Because his colon was dilated, it was not functioning properly to expand and contract in order to expel waste from the body. (Defs.' LR Resp. ¶ 16.) Colon dilation can be decompressed by "placing the patient on intravenous fluids, naso-gastric decompression, attempting to withdraw narcotic medications and correcting any electrolyte imbalance (low potassium)." (*Id.* ¶ 90.) Other conservative methods of treating colon dilation include use of a rectal tube and small tap water enemas. (*Id.*) Decompressing colon dilation can also be achieved with colonoscopy. (*Id.* ¶ 91.) However, that procedure is more invasive, and thus is

generally used after conservative measures have failed, but prior to surgery. (*Id.*) Dr. Sood did not take any of those steps.

Upon reviewing the photographs taken by Marilyn on October 15, 2001, depicting what she asserts was Holmes' condition for at least one week prior to his release from WCADF, Dr. Sood testified that he does not recall Holmes looking like that when he was at WCADF, and if Holmes had looked like that he would have referred him to the hospital. (Photographs and Marilyn Aff. ¶¶ 6, 7; Sood Dep. Vol. II at 119-20.) Dr. Sood testified that he did not order abdominal x-rays or refer Holmes to an outside facility because of Holmes' chronic abdominal condition, multiple surgeries, and previous medical record. (Sood Dep. Vol. II at 198, 202.) However, Dr. Sood admitted that a chronic abdominal condition does not eliminate the possibility of the patient developing an acute condition, such as a bowel obstruction. (*Id.* at 202-03.) Dr. Sood knows that abdominal distention, pain, constipation, nausea, vomiting, and low bowel sounds are symptoms of a bowel obstruction, which if left untreated can lead to death. (*Id.* at 172-74; Sood Dep. Vol. I at 119.) Defs.' LR Resp. ¶ 78.) Dr. Sood also testified that based on Holmes' history of abdominal problems, he would have referred Holmes to the hospital if Holmes' symptoms would have changed suddenly and included a sudden onset of abdominal distention, nausea, vomiting, constipation, and low bowel sounds. (Sood Dep. Vol. II at 120-21.) From September 13, 2001 to October 12, 2001, Dr. Sood was informed that Holmes had experienced acute abdominal pain, abdominal distention, nausea, vomiting, constipation, and low bowel sounds. (Pl.'s LR Resp. ¶ 6; Defs.' LR Resp. ¶ 79; Keenan Aff. ¶¶ 6, 8.)

Dr. James Franklin, one of Holmes' expert witnesses, testified that he does not believe anyone at WCADF intended to injure Holmes, but that they were trying to treat his symptoms and

11

were trying to provide what they thought was appropriate medical attention.[9] (Defs.' LR Ex. D, Dr. James L. Franklin Dep. at 59-60.) Dr. Franklin criticized Dr. Sood's treatment of Holmes as not "particularly appropriate," and stated that the only correct thing done was the physical examination of Holmes. (*Id.* at 60-61, 82, 96-98, 128-32.) Furthermore, Dr. Franklin opined that when Dr. Sood had difficulty examining Holmes' abdomen properly by touch (because of the distention), diagnostic studies, such as an x-ray, were necessary. (*Id.* at 97, 109, 148-50.) Dr. Franklin testified that although subsequent events proved that Holmes did not have a mechanical bowel obstruction, the possibility of obstruction would have been part of Dr. Franklin's analysis when Holmes presented with increasing abdominal distention in September and October 2001. (*Id.* at 99, 149-50.) Dr. Franklin criticized Dr. Sood's failure to refer Holmes out for a series of x-rays or other diagnostic studies. (*Id.* at 97, 132, 149-50.) Instead, Dr. Sood provided Holmes with "symptomatic[]" treatment with continued narcotic pain medications, laxatives, and a stool binding agent. (*Id.* at 59.) Dr. Franklin indicated his opinion that those prescriptions were not the proper medical treatment for Holmes' condition, as it deteriorated. (Franklin Report.) According to Holmes' experts, he should have been treated with nasogastric tube suctioning, intravenous fluids, withdrawal of narcotic medication, small tap water enemas and/or colonoscopic intervention. (*Id.*; Pl.'s LR Ex. I, Ronald Himmelman Expert Report.)[10]

---

[9] In his Response, Holmes argues that Dr. Franklin testified that whether the health care providers were seeking to intentionally injure Holmes was not a topic on which he was rendering an opinion. (Pl.'s LR Resp. ¶ 13.) However, the citations to the record provided do not support that proposition.

[10] Defendants assert that Dr. Franklin does not believe that Dr. Sood should have provided that treatment. (Defs.' LR Resp. ¶ 28.) However, Dr. Franklin's report lists some of the above as the proper treatment for colonic ileus, which he opines is a condition from which Holmes suffered. (Franklin Report.)

**D. Holmes' Health After Release**

Holmes was admitted to Silver Cross Hospital at approximately 8:00 pm. on October 12, 2001, with abdominal distention, but did not have his first abdominal x-ray until the following day. (Pl.'s LR Resp. ¶ 19; Defs.' LR Resp. ¶ 93.) Dr. Darbandi saw Holmes at Silver Cross Hospital on either October 14, 2001 or October 16, 2001.[11] (Darbandi Dep. at 16, 39-40.) When he first saw Holmes, he did not believe immediate surgery was necessary, but rather decided to correct Holmes' electrolytes, repeat the x-ray, and watch him clinically to see if there was any improvement. (*Id.* at 40-41.) There was an attempt to reduce Holmes' colon dilation through conservative measures, including a colonoscopic intervention. (Defs.' LR Resp. ¶ 94.)

Dr. Darbandi decided to operate on Holmes because of the size of the colon dilation, the x-ray findings, severe tenderness and guarding upon examination, and because Holmes was still in a lot of pain and discomfort with no improvement. (Darbandi Dep. at 41.) Dr. Darbandi testified that based on his symptoms, Holmes had a high chance of bowel perforation. (*Id.* at 42.) Dr. Darbandi performed an exploratory laparotomy and a total colectomy, removing portions of Holmes' colon and leaving him with an ileostomy. (*Id.* at 14, 17, 39-42, 65.) During surgery, Dr. Darbandi found that Holmes had extensive chronic distention all the way to the rectum and his colon was dilated approximately 16 to 17 centimeters. (*Id.* at 62, 64.) Dr. Darbandi testified that he does not believe that Holmes had a mechanical obstruction of the bowel in October 2001. (*Id.* at 42.) Dr. Darbandi also opined that if Holmes had less dilation when he presented at Silver Cross Hospital, surgery may have been avoided. (*Id.* at 65-66.) That is consistent with Dr. Franklin's opinion that early

---

[11] Dr. Darbandi is not sure if he examined Holmes on October 16, 2001 or October 14, 2001. Dr. Darbandi's report is dated October 16, 2001, but the pathology report lists a collection date of October 14, 2001. (Darbandi Dep. at 38-40.)

intervention may have prevented the need for surgery. *See* Franklin Report.

After the first surgery, Holmes underwent a second surgery to remove the ileostomy and restore intestinal continuity. (Franklin Report; Darbandi Dep. at 44-46.) Subsequently, Holmes experienced complications from that surgery, specifically an anastomosis leak. (Darbandi Dep. at 44.) After those complications, Holmes was taken back to the operating room and ended up having an ileostomy again. (*Id.* at 45.) Holmes had additional complications with sepsis, a wound infection, which resulted in a long hospital course from which he eventually recovered. (*Id.*)

## LEGAL STANDARD

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. The non-moving party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id.*

14

*See also Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) (non-moving party is required to present evidence of "evidentiary quality" (*i.e.*, admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating the existence of a genuine issue of material fact). "[N]either 'the mere existence of some alleged factual dispute between the parties' ... nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (quoting *Anderson*, 477 U.S. at 247 and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

I.  **Holmes' § 1983 Claims**

A.  **§ 1983 claim against Wexford**

Defendants argue that Wexford is entitled to summary judgment on Holmes' § 1983 claim because the allegations against Wexford appear to be entirely vicarious, and § 1983 does not provide for vicarious liability. (Defs.' Mot. ¶¶ 6, 8, 10; Defs.' Mem. at 5.) In his response, Holmes states that he "does not oppose . . . summary judgment on the separate and independent claim against Wexford under a <u>Monell</u> theory of liability." (Pl.'s Resp. at 5.) Thus, summary judgment in favor of Wexford on Holmes § 1983 claim is granted.

B.  **Holmes' § 1983 claim against Dr. Sood**

Defendants also argue that Dr. Sood is also entitled to summary judgment on Holmes' § 1983 claim because Holmes is unable to prove that Dr. Sood acted with deliberate indifference as required by § 1983. (Defs.' Mot. ¶ 11; Defs.' Mem. at 3-5.)

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, 'sufficiently serious.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation omitted). To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a sufficiently culpable state of mind. *Id.*

### 1. Objective element

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *Greeno*, 414 F.3d at 653. Defendants do not dispute that Holmes' condition was objectively serious, which the record demonstrates. First, upon entering WCADF, Holmes informed Wexford employees that he had chronic abdominal pain and had just had a colostomy reversed. Second, many lay people recognized Holmes' need for medical treatment. Holmes testified that one correctional officer told him, "Your time is running out, you ain't got too many more days left." (Holmes Dep. at 116-17.) Holmes testified that Officer Flannagan also called out for help on his behalf. (*Id.* at 117-18.) Timothy Smith testified that Holmes' stomach started swelling bigger and

bigger each day. (Smith Dep. at 42.) Finally, Julie Sterr testified that she was concerned that Holmes' condition was life-threatening and requested Holmes' release from jail, telling the judge, "You got to let him go, they're going to kill him." (Sterr Dep. at 12, 15-18.)

### 2. Subjective element

The subjective element of deliberate indifference requires that the official "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. However, a prisoner does not have to show that the official intended or desired the harm that transpired. *Greeno*, 414 F.3d at 653. Whether a prison official acted with deliberate indifference is a question of fact and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Defendants correctly point out that neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *See Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (neither alleged negligence nor gross negligence is sufficient); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (evidence of difference of opinion as to whether one course of treatment is preferable to another is insufficient); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (the Eighth Amendment is not a vehicle for bringing claims for medical malpractice); *accord Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir. 1996). However, in order to prevail on an Eighth Amendment claim for deliberate indifference, "a prisoner is not required to show that he was literally ignored by the staff." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000).

17

In *Greeno*, the plaintiff complained to the prison staff of severe heartburn and occasional vomiting, and informed the prison staff of a family history of peptic ulcer disease. 414 F.3d at 649. The prison staff treated the plaintiff's symptoms by prescribing Maalox and noting in his chart that chronic peptic ulcer and gastro-esophageal reflux disease needed to be ruled out. *Id.* However, despite those notations, the prison staff failed to perform any testing and prescribed Maalox and Tagamet, which did not help the plaintiff's pain. *Id.* at 649. The Seventh Circuit reversed summary judgment in favor of the defendants, finding that a prisoner is not required to show that he was literally ignored. *Id.* at 653-54. The court rejected the defendants' contention that the plaintiff's claim should fail because he received some treatment, noting that that argument "overlooks the possibility that the treatment [the plaintiff] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quotation omitted). The Seventh Circuit found that "a factfinder could infer as much from the medical defendants' obdurate refusal to alter [the plaintiff's] course of treatment despite his repeated reports that the medication was not working and his condition was getting worse." *Id.*

In *Sherrod*, the plaintiff presented with pain in his abdomen and symptoms including right lower quadrant abdominal pain, pain on palpation, and pain with eating or moving. 223 F.3d at 608. The defendants acknowledged the risk of appendicitis, which they documented in his charts, but failed to perform the tests needed to rule out appendicitis. *Id.* at 611. Rather, the medical staff placed the plaintiff on a liquid diet, enemas and pain medication, which did not ameliorate his condition. *Id.* The Seventh Circuit held that summary judgment was not appropriate because the evidence raised questions of material fact as to whether the prison medical staff exhibited deliberate indifference by returning the plaintiff to his cell despite the appendicitis symptoms. *Id.*

Likewise, in this case, there are facts from which the jury could infer that Dr. Sood knew that Holmes faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures. Deliberate indifference is a question of fact, and if a risk was obvious, the factfinder may conclude that the defendant knew of a substantial risk. As discussed above, lay people testified that the risk to Holmes' health was obvious. The photographs depicted in Pl.'s LR Ex. L show that Holmes was grossly distended, which would have been obvious to any layperson. When the photographs of Holmes were shown to him at his deposition, Dr. Sood testified that he does not remember Holmes looking like that when he was at WCADF, but he admitted that if Holmes had looked like that, he would have referred him to the hospital. (Sood Dep. Vol. II at 119-20.) Also, Dr. Sood admitted that Holmes' symptoms of abdominal distention, pain, constipation, nausea, vomiting, and low bowel sounds could have been caused by an obstruction, and that an obstruction can lead to death. (Sood Dep. Vol. II at 172-74; Sood Dep. Vol. I at 119.) Although Dr. Sood testified that he did not refer Holmes to an outside facility because of his chronic condition and previous record, Dr. Sood admitted that Holmes' chronic condition did not preclude the possibility that Holmes was in fact suffering from a bowel obstruction. (Sood Dep. Vol. II at 198, 202-03.) From all of the above facts, a reasonable jury could find that Dr. Sood knew of a substantial risk to Holmes' health.

Defendants argue that the only criticism Holmes' experts have expressed in their depositions is Dr. Sood's failure to obtain abdominal x-rays, which, they argue, would at most support a claim of negligence, not deliberate indifference. (Defs.' Mem. at 4-5; Defs.' Reply at 2.) However, that simply is not true. One of Dr. Franklin's criticisms of Dr. Sood was that Holmes should have been referred out for x-rays and other diagnostic studies. (Franklin Dep. at 97, 109, 132, 148-50.)

However, Dr. Franklin also criticized Dr. Sood for treating Holmes symptomatically, without any attempt to evaluate the cause of his symptoms. (*Id.* at 59.) Dr. Franklin opined that although subsequent events proved that Holmes did not have a mechanical bowel obstruction, the possibility of an obstruction would have been part of Dr. Franklin's analysis when Holmes presented with his symptoms. (*Id.* at 99, 149-50.) Further, Dr. Franklin testified that the only thing Dr. Sood did right was to perform a physical examination on Holmes. (*Id.* at 60-61, 82.) Dr. Franklin further indicated his opinion that that the prescriptions Dr. Sood provided could not reasonably be described as proper medical treatment. (Franklin Report.) Holmes' experts opined that Holmes should have been treated with nasogastric tube suctioning, intravenous fluids, withdrawal of narcotic medication, small tap water enemas and/or colonoscopic intervention. (*Id.*; Himmelman Report.) Dr. Sood did not provide any of those treatments. Dr. Darbandi testified that surgery may have been avoided if Holmes had less dilation when he arrived at Silver Cross Hospital. (Darbandi Dep. at 65-66.) Dr. Franklin opined that conservative measures may have been successful and surgery avoided if the problem was detected earlier. (Franklin Report.) Thus, a reasonable jury could find that Dr. Sood disregarded the risk to Holmes' health. Based on all of the above, there is a genuine issue of material fact and summary judgment is inappropriate.

As the Seventh Circuit observed in *Greeno*, a prisoner does not need to show that he was literally ignored. Despite the fact that Holmes received medical attention and pain medication, a factfinder could conclude that the treatment Holmes received was so blatantly inappropriate as to evidence deliberate indifference likely to seriously aggravate his condition, based on Dr. Sood's refusal to alter Holmes' course of treatment despite his repeated reports that the medication was not working and his condition was getting worse. *See Greeno*, 414 F.3d at 654. Thus, summary

judgment is not appropriate on Holmes' § 1983 claim against Dr. Sood.

## II. Holmes' intentional infliction of emotional distress claim

In order to establish a claim for intentional infliction of emotional distress under Illinois law, a plaintiff must show that: (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant knew that there was a high probability that his or her conduct would cause severe emotional distress, or intended for his conduct to cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).

Defendants argue that both Wexford and Dr. Sood are entitled to summary judgment on Holmes' intentional infliction of emotional distress claim because Holmes provided no evidence: (1) that Dr. Sood or Wexford did anything that they thought was harmful to Holmes; (2) that any of the treatment rendered by Dr. Sood was in any way motivated by an abuse of power; or (3) that Dr. Sood's conduct rose to the level which is beyond all bounds of decency or that which cannot be tolerated in a civilized society. (Defs.' Mem. at 5-7.)

Holmes has not presented facts sufficient to allow a reasonable jury to find intentional infliction of emotional distress. In fact, Holmes' response to the motion for summary judgment on this issue consists of three paragraphs and does not attempt to demonstrate what evidence would establish the elements of intentional infliction of emotional distress.

Holmes' own experts both testified that they saw no evidence that Dr. Sood was intentionally trying to harm Holmes. Holmes does not offer any evidence to the contrary. Holmes merely responds that because he was incarcerated, he had no other option than to rely on Dr. Sood to save

his life and that by refusing to provide treatment, Dr. Sood willfully caused Holmes to suffer excruciating pain and come very close to death. (Pl.'s Resp. at 14.) Holmes has failed to meet his burden as he did not designate specific facts showing there is a genuine issue for trial on his intentional infliction of emotional distress claim. *See Celotex*, 477 U.S. at 324.

Holmes argues that all of the facts establishing Dr. Sood's "deliberate indifference" are sufficient to establish intentional infliction of emotional distress for Rule 56 purposes. (Pl.'s Resp. at 15.) However, if that were true, every violation of § 1983 would also be an intentional infliction of emotional distress claim. Furthermore, Holmes' argument ignores the elements of a claim of intentional infliction of emotional distress as established in *McGrath*. During oral argument, Holmes' counsel was unable to cite any precedent in which a failure to act constituted intentional infliction of emotional distress.

Accordingly, Defendants' motion for summary judgment on Holmes' intentional infliction of emotional distress claim is granted.

## III.    Holmes' respondeat superior claim against Wexford

There is no respondeat superior liability under § 1983. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002). Because summary judgment is granted on the intentional infliction of emotional distress claim, there is no underlying cause of action for Holmes' respondeat superior claim. Therefore, because there is no proper claim of respondeat superior, summary judgment in favor of Wexford is granted.

## CONCLUSION

22

For the reasons discussed above, Defendants' Motion for Summary Judgment is granted in part and denied in part. Judgment is entered in favor of both Defendants on Counts II and III and in favor of Defendant Wexford Health Services on Count I. Summary judgment is denied as to Defendant Kul Sood on Count I.

IT IS SO ORDERED.

_Geraldine Soat Brown_
Geraldine Soat Brown
United States Magistrate Judge

December 9, 2005