IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD HOLMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 02 C 7266 |
| v. | ) | |
| | ) | Magistrate Judge Brown |
| DR. KUL SOOD, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S THIRD MOTION *IN LIMINE*
### TO BAR ALL REFERENCES TO PLAINTIFF'S PRIOR SUBSTANCE ABUSE

NOW COMES Plaintiff, EDWARD HOLMES, by his attorneys, LOEVY & LOEVY,

hereby moves this Honorable Court for an order barring all references to Plaintiff's prior

substance abuse. In support, Plaintiff states as follows:

### Introduction

As the Court and the parties here all well know, evidence of substance abuse, particularly

the use of street drugs, is, in some jurors' minds, a deal breaker. They are apt to view people

who have abused drugs or alcohol categorically and moralistically, and would not "waste their

valuable time" parsing the evidence for such a person. In other words, mention of addictions and

substance abuse presents a serious danger that the case will be decided, not on its merits, but

based on prejudice.

For that very reason, the defense here is set on trying to get such evidence in front of the

jury. It would much prefer to turn this case into a trial about Plaintiff's prior drug and alcohol

use to eclipse the uncomfortable facts about how Dr. Sood left Plaintiff to suffer in anguish and

degenerate until his colon had to be removed at a hospital. However, that vain hope must be

rejected because the fact of the matter is that the defense has no genuine basis to argue that the evidence is relevant. Moreover, whatever contrived basis it concocts to argue that the evidence is relevant, it cannot show that the evidence is not unfairly prejudicial. As the party proffering the evidence, this is a burden that it must bear, but cannot meet.

The case law recognizes that attempts such as Defendant's here to interject evidence of substance abuse must be *very* carefully scrutinized by the courts. Moreover, Federal Rules of Evidence 401, 402, 403, and 404(b) all direct that the evidence be excluded absent a substantial probative purpose, a purpose which is lacking here. Accordingly, the Court should bar the evidence.

## Argument

Recognizing the explosive potential for prejudice from substance abuse evidence, courts are extremely cautious and circumspect before letting it into a trial. *See, e.g., United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987) (approving order barring evidence of drug use because "there is considerable danger that evidence that witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony"); *Alexander v. Cit Technology Financing Services, Inc.*, 217 F. Supp. 2d 867, 882 (N.D. Ill. 2002) (barring reference to fact that alleged sexual harassers were not punished for their abuse of drugs and alcohol at work because it was not probative of whether they were indulged to harass, would constitute improper character evidence, and because of "considerable" danger of unfair prejudice from the evidence); *Fletcher v. Conway*, No. 98-5183, 1991 WL 24460, at *2 (N.D. Ill. Feb. 21, 1991) ("Evidence of prior drug use is highly prejudicial. . . . Even had Conway advanced a proper theory for admissibility, any probative value evidence of past cocaine use may have in this

2

case is substantially outweighed by the potential of unfair prejudice. Past cocaine usage would serve to misfocus the jury's attention from the central issues in this case. Allowing Conway to introduce evidence to prove that Fletcher was a frequent cocaine user would create a trial within a trial on a collateral issue potentially consuming a great deal of time with only slight probative effect").

Courts are correctly wary of such evidence because parties can dream up all manner of grounds to claim that such evidence should be put before the jury, and often do so precisely because they desire the unfair prejudice. For this reason, the Seventh Circuit has warned that "[a] court must . . . be chary in admitting such evidence when it is offered" and take care that the proponent is not making tenuous claims of relevance in the real hope of getting the evidence in for "a general character attack." *Cameron*, 814 F. 2d at 405.

Here, Plaintiff was cognizant of the extraordinary danger of unfair prejudice from such evidence and concerned that Defendant may hope to misuse it. In accordance with LR 37.1, Plaintiff asked Defendant to agree that his history of drug and alcohol use was irrelevant and should not be mentioned at trial. Counsel for Defendant refused stating (when pressed) that they wanted to admit it to support an argument that Plaintiff's chronic colon condition (a condition called "ileus" which he suffered from long before he ever met Dr. Sood) was caused by substance abuse.

This claimed ground for admission presents a classic circumstance for the type of "chary" scrutiny the Seventh Circuit has prescribed. While it may seem logical at a passing glance, careful scrutiny reveals that the proffered purpose has no bearing on any matter that is of

consequence to this case.[1] The entire issue of how Plaintiff's ileus came to be is an irrelevant

sideshow calculated to sneak in bad character evidence that the jury has no need to hear.

### The fact that Plaintiff suffered from ileus is relevant to the case but the reasons why he developed ileus are meaningless.

It is undisputed that before Plaintiff came to the Will County Adult Detention Facility he

had a chronic colon condition called ileus, which meant that his colon was often dilated and

therefore poor at moving excrement through his system. *See* Exhibit A (Dr. James Franklin

Dep.) at 53-54. Undoubtedly, the fact that Plaintiff had this condition is relevant to the case:

Plaintiff asserts that Sood had to consider the ileus in his treatment decisions, and Defendant will

no doubt want the jury to know that Plaintiff already had colon problems when he met Plaintiff

so that they appropriately limit any award of damages to the additional injuries that Sood caused.

However, the reasons *why* Plaintiff developed the ileus are of no consequence to any

matter at issue in the case and they are therefore inadmissible under FRE 401 and 402. There are

multiple possible causes of ileus. It can result from prior intestinal surgery, surgery to other areas

of the body under general anesthesia, use of *prescribed or illegal* narcotics, prior infections, or

from unknown autoimmune problems, to name but a few. *See, e.g.*, Exhibit B (testimony of

Defendant's expert Dr. John Clark) at 124-125, 128; *see also* Exhibit A (Franklin Dep.) at 40-41

("sometimes it's not possible to identify the specific cause. Patients who have an autoimmune

disease of the intestine, such as scleroderma, can develop dilation of the colon. There are many

different possibilities").

---

[1]     Under FRE 402 only "relevant evidence" is admissible. FRE 401 limits "relevant evidence" to on that "evidence having any tendency to make the existence of any fact that is *of consequence* to the determination of the action more probable or less probable than it would be without the evidence." FRE 401 (emphasis added).

4

Importantly, regardless of the cause of the ileus, the treatment is the same. *See* Exhibit A (Franklin Dep.) at 155; Exhibit C (Dr. Ronald Himmelman Dep.) at 122. The reasons why Plaintiff developed his ileus are therefore irrelevant to whether Sood was deliberately indifferent to the condition by failing to take measures to decompress the colon or send Plaintiff to a hospital. Similarly, the source of the ileus is irrelevant to the issue of damages. What matters for damages is the fact that Plaintiff had a preexisting condition which he would have continued to suffer regardless of Sood's alleged misconduct. The reasons *why* Plaintiff suffered that condition have no bearing.

In short, the defense has no need to prove why Plaintiff suffered from the ileus. It cannot offer prejudicial evidence to "prove" something that is of no consequence to the case.

Separately, it is also true that Defendant fails to satisfy a necessary factual predicate to admitting evidence of Plaintiff's prior substance abuse. There are multiple potential causes of ileus in Mr. Holmes' history aside from substance abuse. He has had prior surgery to his colon, multiple hip replacements, and has been on prescribed narcotic medications for his orthopedic problems for a decade or more. *See* Exhibit A (Franklin Dep.) at 37 (prior colostomy), Exhibit D (Holmes Dep.) at 27 (hip replacements), Exhibit E (1996 medical record of narcotic pain medication - Tylenol 3).[2] Defendant offers no evidence to show how these various other matters did not cause or contribute to Mr. Holmes' ileus. For example, they have offered no basis to distinguish between the causative effect of Mr. Holmes' use of prescription narcotic pain relievers for his orthopedic problems versus his use of illegal street narcotics, and their own

---

[2] Plaintiff's history of prescription narcotic pain relievers dates back significantly further than 1996, but he does not have medical records going back further than that date.

expert admitted as much at his deposition, stating:

Q His condition was aggravated by narcotics generally whether prescribed or unprescribed; is that correct?

A: Narcotics and alcohol.

Q: But narcotics have the same effect on the colon basically whether they're prescribed or not prescribed; is that correct?

A That's a reasonable conclusion.

Exhibit B (Clark Dep.) at 128.[3] Likewise, Plaintiff's expert Dr. Franklin also testified that the effect of the narcotics is the same:

Q: Another way that you can lose that ability to expand and contract those muscles is through drug use and abuse, correct?

A: Correct.

Q: Specifically narcotics, correct?

A: Correct.

Q: And those can either be prescription or nonprescription, correct?

A: Correct.

Q: In other words, I can lose that by being a heroin addict or by having Demerol prescribed for me extensively, correct?

A: Right.

Exhibit A (Franklin Dep.) at 36.

---

[3] Not that Defendant should be permitted to force Plaintiff into a debate in front of the jury about whether, or the degree to which, substance abuse is to blame for his ileus versus the other potential factors because the entire issue is irrelevant and merely allowing in the fact of substance abuse engenders the dangerous unfair prejudice. Thus, Plaintiff could easily win the battle about whether substance abuse is to blame for his ileus but lose the war because the jury was told about his substance abuse in the first place.

## Conclusion

All of the above shows that Defendant has no need to put on evidence about why Plaintiff suffered ileus, and its proffered justification is simply a guise to inject unfairly prejudicial evidence of bad character. That is precisely the situation in which the Seventh Circuit warned courts to be circumspect and to reject substance abuse evidence absent very good reasons. Such reasons are lacking here and the evidence must be barred under FRE 401, 402, 403 and 404(b).

### Local Rule 37.2 Statement

Prior to filing this motion, Plaintiff's counsel disclosed the motion to defense counsel, along with a short description of what specifically Plaintiff sought to bar and why. On March 21, 2006 at 3:30 p.m. at the location of the law offices of Charysh & Shroeder, Plaintiff's counsel, Michael Kanovitz and Amanda Antholt, met with Defendant's counsel, Michael Charysh and Richard A. Tjepkema, to discuss this motion. Unfortunately, after good faith attempts to resolve this issue, the parties were unable to reach an accord.

RESPECTFULLY SUBMITTED,

_____
Attorneys for Plaintiff

Arthur Loevy
Michael Kanovitz
Amanda Antholt
LOEVY & LOEVY
312 North May Street, Ste. 100
Chicago, IL 60607
(312) 243-5900

Dep-Franklin

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4   EDWARD HOLMES,              )
 5          Plaintiff,           )
 6          -vs-                 ) No. 02 C 7266
 7   DR. KUL SOOD and WEXFORD    )
 8   HEALTH SOURCES, INC.,       )
 9          Defendants.          )
10
11       The deposition of JAMES L. FRANKLIN, M.D.,
12   called for examination pursuant to Notice and
13   the Rules of Civil Procedure for the United States
14   District Courts pertaining to the taking of
15   depositions, taken before MARLENE L. RENO, C.S.R.,
16   a notary public within and for the County of Cook
17   and State of Illinois, at 33 North Dearborn Street,
18   Suite 1300, Chicago, Illinois, on the 24th day
19   of June, 2004, at the hour of 11:30 o'clock a.m.
20
21
22
23
24
```

1

```
 1     APPEARANCES:
```

Page 1

Dep-Franklin

24      A.   I did not clearly see a statement of

                                                36
               McCORKLE COURT REPORTERS, INC.
               CHICAGO, ILLINOIS - (312) 263-0052

D

1    that in the records prior to his hospitalization --
2        Q.   Okay.
3        A.   -- and prior to his incarceration.
4        Q.   All right.  So you don't know.
5        A.   I don't.
6        Q.   Another way that you can lose that ability
7    to expand and contract those muscles is through
8    drug use and abuse, correct?
9        A.   Correct.
10       Q.   Specifically narcotics, correct?
11       A.   Correct.
12       Q.   And those can either be prescription
13   or nonprescription, correct?
14       A.   Correct.
15       Q.   In other words, I can lose that by being
16   a heroin addict or by having Demerol prescribed
17   for me extensively, correct?
18       A.   Right.
19       Q.   Did you see anything in Mr. Holmes'
20   medical history that you reviewed that indicated
21   that prior to the events at issue in this case
22   he lost the ability to expand and contract
23   those muscles because of drug use or abuse?
24       A.   The records indicate that he had problems

Dep-Franklin

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1    with intestinal motility prior to his incarceration

2    and that narcotics appear to be an aggravating

3    factor.

4        Q.    In fact prior to his incarceration that's

5    at issue in this case, at one point he had a

6    colostomy, correct?

7        A.    Correct, but the reason for that, he had

8    a temporary -- he had resection of his sigmoid

9    colon and a temporary colostomy, but as I read

10   the records, they thought he had mechanical

11   obstruction.

12        It's not 100 percent clear that that

13   was the case in reviewing the records, but

14   nevertheless that was part of the thinking

15   from what I read in the record.

16       Q.    If I lose the ability to expand and

17   contract the muscles that we've been describing

18   so that waste cannot be expelled, my colon can

19   dilate, correct?

20       A.    Correct.  Although the line of your

21   questioning implies that all passage of feces

22   from the stool -- from the rectum would stop

23   if the colon dilated, and that is not necessarily

24   so.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

Dep-Franklin

2       Q.    Now, I don't think we got to the point

3  of you telling me what caused -- or strike that.

4             I don't think we got a clear answer on

5  what it is that Ogilvie's Syndrome is.  Is it

6  just the inability to use those muscles?

7       A.    Ogilvie's Syndrome is dilatation of the --

8  marked dilatation of the colon.

9       Q.    When you say dilatation, you're talking

10 about the --

11      A.    Increased diameter.

12      Q.    Like the garden hose we talked about.

13      A.    Correct.

14      Q.    And what causes that?

15      A.    Well, it is a failure of the neuromuscular

16 apparatus of the intestine, which may result from

17 a variety of causes.  For example, a patient

18 who undergoes orthopedic surgery, such as a hip

19 replacement, frequently such patients develop

20 Ogilvie's Syndrome in the postoperative period,

21 even though nothing has been done mechanically

22 to their large intestine.

23            As an example, patients who abuse

24 laxatives chronically may develop dilatation

40

MCCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

◻

1  of the colon, as you mentioned, and also

2  long-standing narcotic usage can contribute

3  to dilatation of the colon.

4            Sometimes the dilatation of the colon
                        Page 37

Dep-Franklin

5   can occur as a result of an infectious or

6   inflammatory process of the colon, such as

7   ulcerative colitis, or, for example, an amoebic

8   infection or infection with Salmonellosis,

9   and sometimes it's not possible to identify

10  the specific cause.

11          Patients who have an autoimmune disease

12  of the intestine, such as scleroderma, can develop

13  dilatation of the colon.  There are many different

14  possibilities.

15      Q.   You have never met Mr. Holmes, have you?

16      A.   Correct.

17      Q.   You never examined him?

18      A.   Correct.

19      Q.   Your knowledge of his condition is limited

20  to the medical records that you have reviewed,

21  correct?

22      A.   Correct.

23      Q.   Now, when did Mr. Holmes' Ogilvie's

24  Syndrome arise, and what caused it?


41
MCCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

☐

1       A.   It would appear that in the

2   hospitalization in July prior to his being

3   incarcerated he had a condition that sounded,

4   from reviewing the records, that it might be

5   a form of Ogilvie's Syndrome.

6       Q.   Can you pin down a date and a cause with

Page 38

Dep-Franklin

7   precision?

8       A.   Beyond what I said I don't think so.

9       Q.   Okay.  Have you reviewed all of

10  Mr. Holmes' medical records?

11      A.   In addition to the records that are

12  indicated on the letter that I wrote on May 14,

13  I did review the October hospitalization today,

14  the complete hospitalization records.

15      Q.   So prior to writing this report and

16  rendering these opinions, you had not reviewed

17  the complete records for Mr. Holmes'

18  hospitalization at Silver Cross Hospital

19  in October of 2001, correct?

20      A.   Correct.  I had reviewed a sampling

21  of what was felt to be the pertinent records.

22      Q.   And that sampling was given to you

23  by Mr. Holmes' lawyers, correct?

24      A.   Correct.


42

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

□

1       Q.   They determined what they thought was

2   important for you to look at, and they sent it

3   to you, correct?

4       A.   Correct.

5       Q.   Did you ever ask them, "Do I have all of

6   this man's medical records?"

7       A.   I knew I didn't.

8       Q.   Did you ask for a complete set of his

9   medical records?

Page 39

Dep-Franklin

3      A.   Yes.

4      Q.   All right.  The medical records from

5   Silver Cross Hospital, which are on the table

6   in front of us, correct?

7      A.   Correct.

8      Q.   And you also read the deposition

9   of Dr. Darbandi, D-a-r-b-a-n-d-i, correct?

10     A.   I did.

11     Q.   And that's it?

12     A.   That is it.

13     Q.   All right.  The next paragraph appears

14   to indicate that you have certain professional

15   qualifications and what you're doing currently

16   over at Rush, correct?

17     A.   Yes.

18     Q.   So more or less sets out your

19   qualifications.

20     A.   Yes.

21     Q.   The third full paragraph, which starts

22   on Page 1 and continues to Page 2, basically gives

23   some opinions -- strike that.

24          The third, fourth and fifth paragraphs

53

□

1   in your report contain your opinions, correct?

2      A.   Not strictly.  For example, the fact

3   that his colon was dilated is a matter of record.

4   The fact that he has abnormalities in fluid and

5   electrolytes and low potassium were a matter of

Page 49

Dep-Franklin

6  record as well as the surgery that he had and

7  surgical findings.

8      Q.   All right.  But if there are opinions,

9  they're in those three paragraphs, aren't they?

10     A.   That is correct.

11     Q.   All right.  Let's start with Paragraph 3.

12  You indicate that based on your review of the

13  records that you were provided Mr. Holmes suffered

14  from chronic intestinal ileus and chronic

15  pancreatitis prior to his incarceration, and you

16  were basing that on his medical records from

17  Silver Cross from July of 2001, correct?

18     A.   Yes.

19     Q.   What's chronic intestinal ileus,

20  if you have to explain that to a layperson?

21     A.   It's -- as opposed to something that has

22  developed suddenly, something -- it is a condition

23  that's been present for some period of time

24  and involves dilatation of any portion of the

54

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1  intestinal tract.

2      Q.   What is an intestinal ileus?

3      A.   It's dilatation of some portion or all

4  of the intestinal tract without a mechanical

5  obstruction.

6      Q.   Okay.  Is that different from Ogilvie's

7  syndrome?

Page 50

Dep-Franklin

8    A.   Yes.  As I have indicated, Ogilvie's

9 Syndrome is an ep' -- is a specific condition

10 involving dilatation of the colon, and it was

11 originally described in a small number of patients

12 with lung cancer before it was recognized that

13 this could occur under many other circumstances,

14 which is why the term has largely been dropped.

15    Q.   Okay.  Your opinion that Mr. Holmes

16 had Ogilvie's Syndrome before his incarceration,

17 is that a different condition than the chronic

18 intestinal ileus that you're describing in this

19 paragraph?

20    A.   No.  I don't believe I used the term

21 Ogilvie's Syndrome.  You've used it.  And you

22 were using it roughly synonymously with

23 pseudo-obstruction of the colon, nonobstructive

24 pseudo-obstruction of the colon.  That is where

55

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

1 the colon is dilated and there is no mechanical

2 obstruction.

3              (WHEREUPON, there was a short

4              interruption.)

5              (WHEREUPON, a discussion was had

6              off the record.)

7 BY MR. CHARYSH:

8    Q.   When you use the term in your report

9 "chronic intestinal ileus," is that different

10 or the same as Ogilvie's Syndrome?

Page 51

Dep-Franklin

6    else?

7        A.   I can see certain circumstances under

8    which it would.  For example, if a patient presents

9    with ulcerative colitis and a distended colon,

10   the treatment is different than if the patient

11   has pseudo-obstruction of the colon.

12           If the patient suffers from underlying

13   scleroderma of the colon, which is a rheumatic

14   or inflammatory disease, the treatment is

15   different, for example, than it would have been

16   under these circumstances.  So that some assessment

17   of what the underlying cause is can affect the

18   treatment.

19       Q.   Okay.  Now, what you've just described

20   to me, though, am I correct to say that those are

21   different conditions or diseases that would require

22   different treatments?

23       A.   They are.

24       Q.   Okay.


155

□


1        A.   But they are in a sense similar in

2    that in both -- in all circumstances the colon

3    is dilated and distended but not mechanically

4    obstructed.

5            It falls into that category of

6    nonobstructive syndromes of the colon.  Some are

7    idiopathic, which means that nobody knows the

8    cause, and some are secondary to specific diseases.

Dep-Franklin

 9      Q.    Okay.  Now, to ask it sort of in a
10   different way, if Mr. Holmes had the exact same
11   condition in September and October of 2001, but it
12   was caused or the underlying factors from years
13   ago were something different besides narcotic
14   use or alcohol use, would that change your opinions
15   here?
16      A.    No, because the treatment would still
17   be the same even if narcotic -- if, for example,
18   chronic narcotic abuse had contributed to the
19   dilatation of the colon or this problem, one would
20   still treat it in a manner along the lines that
21   I've already outlined.
22      Q.    Okay.  You were also asked earlier in
23   your testimony about the causal chain in the
24   relationship of the subsequent surgery that

156
MCCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

☐

 1   Mr. Holmes has undergone since the October 2001
 2   surgery.  Do you recall that?
 3      A.    Yes.
 4      Q.    Mr. Charysh asked you sort of but for
 5   question relating to that Mr. Holmes may have
 6   conceivably, even if none of this had ever
 7   happened, perhaps under some set of circumstances
 8   we can imagine he may have had to have similar
 9   surgery.
10      MR. CHARYSH:  Objection.  Mischaracterizes

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EDWARD HOLMES,                  )
                                )
          Plaintiff,            )
                                )
     -vs-                       )  No. 02 C 7266
                                )
DR. KUL SOOD and                )
WEXFORD HEALTH SOURCES, INC.,   )
                                )
          Defendants.           )


        Deposition of DR. JOHN H. CLARK, JR. taken

before KERI L. HOCHMAN, C.S.R., and Notary Public,

pursuant to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the taking

of depositions, at Suite 100, 312 North May Street, in

the City of Chicago, Cook County, Illinois at

10:40 o'clock a.m. on the 9th day of September, A.D.,

2004.

1   dilation of the intestines, and basically it can become

2   a chronic state.

3       Q   Okay.  It can also be an acute state; is that

4   correct?

5       A   Yes.  And that's frequently what we see in

6   patients that have surgery.  That's one of the post-op

7   complications that we look for particularly in doing

8   "gyn" surgery.  That's why we try to get patients up out

9   of bed and walking as soon as possible and ascertaining

10  whether or not bowel sounds have returned and those

11  kinds of things.  So certainly that's something you may

12  see as a part of the post-operative course in anyone who

13  has had abdominal surgery.

14      Q   Okay.  What else besides abdominal surgery in

15  the post-operative course can cause that kind of failure

16  of the intestines?

17      A   Well, there is the school of thought that

18  suggests that certain types of substances both

19  prescribed and illegal can impact on the intrinsic

20  muscles and the motility of the GI track.

21      Q   Narcotics can affect the neuromuscular --

22      A   That's one category, yes.

23      Q   Okay.  Besides narcotics, the neuromuscular

24  failure of the intestine can be caused by an assortment

Page 125

1    of other factors as well; isn't that correct?

2        A    Yes.

3        Q    Okay.  It can be caused by an infection or

4    inflammation of the colon?

5        A    That is true.

6        Q    Okay.  And oftentimes patients who have

7    undergone orthopaedic surgery that have nothing to do

8    with the abdomen will suffer similar problems?

9        A    Yes.  Any time you undergo general anesthesia,

10   you know, that can cause a decrease in motility in the

11   GI track.

12       Q    Okay.  Looking at your opinions that start on

13   Page 6 and go to 7.  You've given five opinions in the

14   case.  Does this report include all of the opinions

15   you've made in this case?

16       A    Yes, it does.

17       Q    Okay.  And the first opinion that you have

18   listed here summarizes the complaints and presentation

19   of Mr. Holmes; is that correct?  Is that what that

20   paragraph is doing?

21       A    I don't know if it summarizes.  I think it

22   indicates that he presented with this history of chronic

23   abdominal pain.

24       Q    Okay.  The second opinion that you have listed

1    can go hand in hand, or they can occur independently of

2    each other.

3        MS. ANTHOLT:   Q   Because a patient has a chronic

4    condition, you still look for acute symptoms and are

5    aware of those processes; is that correct?

6        A    Yes.

7        Q    Okay.   You indicate in the last part of number

8    two that his condition was aggravated by abuse of drugs.

9    His condition was aggravated by narcotics both

10   prescription and possibly non-prescription; is that

11   correct?

12       A    Say that again.

13       Q    His condition was aggravated by narcotics

14   generally whether prescribed or unprescribed; is that

15   correct?

16       A    Narcotics and alcohol.

17       Q    But narcotics have the same effect on the colon

18   basically whether they're prescribed or not prescribed;

19   is that correct?

20       A    That's a reasonable conclusion.

21       Q    Okay.   So if a patient has colon problems,

22   history of ileus and he's on narcotics being prescribed

23   narcotics, do you as a physician take any special steps

24   to monitor his condition or otherwise monitor the effect

b74390d6-75c1-40b1-b968-c59252194c1b

040616_-_ronald_himmelman_md

1      IN THE UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

4

5

6 EDWARD HOLMES                    )

7          Plaintiff,             )

8     vs.                         )  No. 02 C 7266

9 DR. KUL SOOD and WEXFORD        )

10 HEALTH SOURCES, INC.,          )

11          Defendants.           )

12

13        The discovery deposition of DR. RONALD

14 HIMMELMAN, taken in the above-entitled cause,

15 before JANET O. DAVIS, a notary public of Cook

16 County, Illinois, on the 16th day of June, 2004, at

17 the hour of 11:00 o'clock a.m., at 33 North

18 Dearborn Street, Suite 1300, Chicago, Illinois,

19 pursuant to notice.

20

21

22

23 Reported by:    Janet O. Davis, CSR

24 License No.:    084-001099

1

MCCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263 - 0052

1    APPEARANCES:

2        LOEVY & LOEVY, by

Page 1

040616_-_ronald_himmelman_md

14 specimen is in surgery.  Saying it was collected

15 during the surgical procedure.

16    Q    So the surgery had to come before the

17 pathologist report which was based on the specimen,

18 is that correct?

19    A    Yes.

20    Q    Okay, thank you.  You were also asked

21 some questions earlier relating to causation

22 factors of non-functioning colons in relation to

23 narcotic use --

24    A    Yes.

122

MCCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263 - 0052

☐

1    Q    -- do you recall that?  And you testified

2 that narcotic use could be one contributing factor

3 or causal factor of a non-functioning colon, is

4 that correct?

5    A    That's correct.

6    Q    Could there be other causes for a

7 non-functioning colon?

8    A    Many.

9    MR. CHARYSH:  I'm sorry?

10    THE WITNESS:  Many.

11    MR. CHARYSH:  Thank you.

12 BY MS. ANTHOLT:

13    Q    Does your treatment and diagnosis of

14 patients presenting as Mr. Holmes did during

15 September and October of 2001, change based on what

16 that initial causation factor was?

Page 109

040616_-_ronald_himmelman_md

17    A    No.

18    Q    Okay.  Would your opinions change or the

19 steps you take to diagnose what is causing the

20 symptoms change in any way because it was caused by

21 narcotic use or is there something else?

22    A    No.

23    Q    Okay.  Am I correct in saying that the

24 report you have done on this case and the opinions

123

1 you have given in this case relate to the care

2 given in September and October 2001 at the Will

3 County Adult Detention Facility?

4    A    Yes.

5    Q    Okay.  And in order to give those

6 opinions did you need in any way to review

7 documents that the Will County Detention Facility,

8 the medical unit staff and Dr. Sood did not have

9 during September and October of 2001?

10    A    No.

11    Q    And would those documents from either

12 before that detention or after change your opinions

13 in this matter in any way?

14    A    No.

15    Q    Mr. Charysh also asked you some

16 questions earlier in the deposition if anyone or if

17 Dr. Sood intentionally blocked requests for

18 different medical treatment, do you recall that?

19    A    Yes.

20    Q    Is it your understanding that Mr. Holmes
                      Page 110

Dep - Holmes

0001
```
 1
              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
 3
        EDWARD HOLMES,                       )
 4                                           )
                   Plaintiff,                )
 5                                           )
            vs.                              ) No. 02 C 7266
 6                                           )
        WILL COUNTY SHERIFF BRENDAN D.       )
 7      WARD, in his official capacity,      )
        WEXFORD HEALTH CARE SOURCES,         )
 8      INC., unknown HEALTH CARE            )
        PROVIDERS, and unknown WILL          )
 9      COUNTY ADULT DETENTION FACILITY      )
        CORRECTIONAL OFFICERS,               )
10                                           )
                   Defendants.               )
11
12                      The deposition of EDWARD HOLMES,
13      taken before Eileen Bailey, a notary public in
14      and for the County of DuPage and State of
15      Illinois, taken pursuant to the Federal Rules of
16      Civil Procedure for the Northern District
17      Illinois, at Suite 195, 333 Pierce Road, Itasca,
18      Illinois, on Wednesday, March 5, 2003, at the
19      hour of 10:30 o'clock, a.m., pursuant to Notice.
20
21
        Reported for
22      ADVANTAGE REPORTING SERVICE, by
        Eileen Bailey, CSR, RPR
23
0002
 1      APPEARANCES:
 2
                LOEVY & LOEVY,
 3              ( 312 North May Street,
                  Suite 100,
 4                Chicago, Illinois  60607), by:
                  312 243-5900,
 5              MS. AMANDA ANTHOLT,
                    appeared on behalf of the Plaintiff;
 6
 7              HERVAS, SOTOS, CONDON & BERSANI,
                ( 333 Pierce Road,
 8                Suite 195,
                  Itasca, Illinois  60143), by:
 9                630 773-4774
                MR. JASON W. ROSE,
10                  appeared on behalf of the
                    Defendants,
11                  Will County Sheriff Brendan D. Ward,
                    in his official capacity, and
12                  unknown Will County Adult
                    Detention Faculty Correctional
13                  Officers.
14
                CHARYSH & SCHROEDER, LTD.,
15              ( 33 North Dearborn Street,
```
                                    Page 1

Dep - Holmes
16   withdrawal problems. Do you recall that?
17         A.   No, I don't remember that.
18         Q.   Okay.
19         A.   They don't take you to the hospital for
20   drug withdrawal.
21         Q.   I am going to read an inter-office
22   communication dated March 15, 1990, from Deputy
23   T. Kuzma to a Sergeant Canada.
0026
 1         MR. BURTON:  What was the date?
 2         MR. ROSE:  March 15, 1990.
 3         MS. ANTHOLT:  And the Bates stamped number?
 4         MR. ROSE:  1478.  And this one is shorter.
 5   "On the above date at approximately 7:15 a.m.
 6   Inmate Holmes in cell 1-A was complaining he was
 7   sick.  Deputy Gerrat reported Inmate Holmes was
 8   sweating and did look sick.  The nurse was
 9   notified and Inmate Holmes was transported to
10   Silver Cross Hospital."  Do you recall being
11   transported to Silver Cross Hospital sometime in
12   March of 1990 while at the Will County Facility?
13   You don't recall?
14         A.   I don't recall, because they don't take
15   you for withdrawal.
16         Q.   It says, "Holmes was returned at
17   approximately 10:30 a.m.  He was treated for drug
18   withdrawal problems.  Inmate Holmes was put back
19   in Cell 1-A."  So, you don't recall this incident
20   one way or the other, is that correct?
21         A.   That's correct.
22         Q.   And, again, just so we are clear, you
23   are not saying you weren't taken to Silver Cross
0027
 1   Hospital, you just don't have any recollection,
 2   correct?
 3         A.   I don't have any recollection.
 4         Q.   Okay.  You have had hip surgery before,
 5   correct?
 6         A.   Correct.
 7         Q.   Right hip, or left hip, or both hips?
 8         A.   Both hips.
 9         Q.   Where was that?
10         A.   St. Joe.
11         Q.   Did you have both hips replaced at the
12   same time?
13         A.   No, I didn't.
14         Q.   When were your hips -- when did you
15   have the hip surgeries?
16         A.   One in '89, I believe, and the other
17   one the first part of '90.  '91, '92.
18         Q.   Do you recall which one was replaced
19   first?
20         A.   My right hip was replaced first, I
21   believe.
22         Q.   And both surgeries were at St. Joe's?
23         A.   Yes, I believe so.
0028
 1         Q.   Do you recall who your surgeon was?
 2         A.   Yes.  Dr. Duffy, John Duffy.
 3         Q.   Did he do both of your surgeries?
 4         A.   Yes, he did.
 5         Q.   Have you seen Dr. Duffy for anything
 6   since that time?

**Silver Cross Hospital**
Joliet, Illinois

## EMERGENCY DEPARTMENT RECORD

HISTORY NO. 161183
FINANCIAL NO. F3485778

PATIENT'S NAME: Holmes Edward
DATE & TIME OF ADM. 1-25-96 1700
D.O.B. 7-6-54 AGE 42 SEX M

MODE OF ARRIVAL: ☐ WALK ☐ W/C ☑ CART ☐ CARRIED
ACCOMPANIED BY: Police

☐ BLS
☑ ALS

☐ EMERGENT ☑ URGENT ☐ NON-URGENT

ADVANCE DIRECTIVES: ☐ DNR ☐ LIVING WILL ☐ DURABLE POA HEALTHCARE
☑ NONE ☐ UNKNOWN DOCUMENTATION WITH PT. ☐ YES ☐ NO
LANGUAGE BARRIER ☐ YES ☑ NO
INTERPRETER (N/#):

GLASGOW COMA SCALE ☑ 15 ☐ <15 SEE NURSES NOTES

PRESENTING COMPLAINT/HISTORY, ONSET OF SYMPTOMS:
Pain to (R) thigh onset 1 day ago
pt also c/o blood in urine + states
refrigerator fell on leg on 1/24/96. Pt
states has had blood in urine for a
couple of weeks. Pt 91943 et smmmm

SIGNATURE: A. Barnowski RN
(REACTION)

DISTRESS: ☐ NONE
☑ MILD ☐ ANXIETY ☐ RESPIRATORY
☐ MODERATE ☐ BLEEDING
☐ SEVERE ☐ PAIN

WEIGHT / kg 86.8 ☐ ESTIMATED ☑ ACTUAL
HEIGHT / cm ☐ ESTIMATED ☐ ACTUAL

LAST TETANUS ☑ N/A      LMP ☑ N/A

VISUAL ACUITY ☑ N/A      OD      OS      OU
☐ CORRECTION
☐ NO CORRECTION  WEARS CORRECTION ☐ YES ☐ NO

**ALLERGIES TO MEDICATIONS** ▶ NKA

| TIME | TEMP | O/R | B/P | P | R | INITIALS |
|------|------|-----|-----|-----|-----|------|
| | 98.6 | | 150/110 | 122 | 20 | a |
| | | | | | | |

ATTENDING PHYSICIAN Nos Dubey
PHYSICIAN CALLED Bhalla   TIME 18.46   RETURN   ARRIVED

| MEDICATIONS/DOSAGE | FREQ | LAST DOSE | MEDICATIONS/DOSAGE | FREQ | LAST DOSE |
|--------------------|------|-----------|--------------------|------|-----------|
| Ventolin | | | | | |
| Tylenol #3 | | | | | |

P.M.H. ☐ NONE ☑ ASTHMA ☐ BRONCHITIS ☐ CHF ☐ COPD ☐ CRF ☐ DIABETES ☐ HTN ☐ MI
☐ OTHER: 12 ears (B) Hip replacement

HISTORY TIME ___ AM ___ PM

PHYSICAL EXAM

☐ SEE SUPPLEMENT                Dictated
                                ☑ SEE DICTATION

| | TESTS | | | PROCEDURES / IV'S / MEDS / TREATMENTS | INITIALS |
|---|-------|---|---|---|---|
| EtOH | PT PTT | Tylenol | | NG tube | |
| EtOH lvl | U/A | x-ray @ knee & Hip P&L | | Thiamine 100 mg IM | |

DIAGNOSIS: GI bleed / Alcoholic Gastritis

DISCHARGE INSTRUCTIONS

DISPOSITION CONDITION ON DISCHARGE: ☐ GOOD ☐ FAIR ☐ SERIOUS ☐ CRITICAL
MODE OF DISCHARGE: ☐ VIA SELF ☐ RELATIVE/FRIEND ☐ OTHER

☐ HOME ☐ DIE ☐ DOA ☐ LWBS ☐ AMA ☑ ADMIT ☐ OBV TO DR. Bhalla (ATTD)
ROOM NUMBER 2117
TIME 1930
☐ TRANSFER TO ___ VIA ___

| TRIAGE | INSURANCE |
|--------|-----------|
| TO ED TX | ROOM |
| TO X-RAY | RTN X-RAY |
| ADM CALL 1905 | RM ASSIGN 1910 |
| NOTIFIED ☐ RELATIVE | |
| ☐ POLICE | |
| ☑ NURSING HOME | |
| TIME | INITIAL |

PHYSICIAN SIGNATURE ___   RN SIGNATURE ___   RN SIGNATURE A. Barnowski RN

WHITE - PG.1 - MEDICAL RECORDS    WHITE - PG.2 - INPATIENT CHART    CANARY - PHYSICIAN BILLING    BLUE - INSURANCE    PINK - ATTENDING PHYSICIAN

4260